[S.F. No. 24324. May 27, 1982.]

AGRICULTURAL LABOR RELATIONS BOARD, Plaintiff and
Respondent, v.
CALIFORNIA COASTAL FARMS, INC., Defendant and Appellant;
UNITED FARM WORKERS OF AMERICA, AFL-CIO, Defendant
and Respondent.

COUNSEL

Dressler, Quesenbery, Laws & Barsamian, Dressler, Stoll, Hersh & Quesenbery, Lewis P. Janowsky, Wayne A. Hersh, Patrick D. Leathers, Marion I. Quesenbery, Laurie A. Laws, George McInnis and Abramson, Church & Stave for Defendant and Appellant.

Ellen Lake, Manuel M. Medeiros, Daniel G. Stone, Frances C. Schreiberg and Edwin F. Lowry for Plaintiff and Respondent.

Kirsten L. Zerger, Sanford N. Nathan, Jerome Cohen, Marco E. Lopez, Carlos M. Alcala, Francis E. Fernandez, Carmen C. Flores and Dianna Lyons for Defendant and Respondent.

OPINION

**KAUS, J.**—California Coastal Farms, Inc. (Coastal), appeals from a preliminary injunction granting striking United Farm Workers of America, AFL-CIO (UFW) limited access to Coastal's property for the purpose of communicating with nonstriking farm workers. We have concluded that the trial court's grant of limited access was not an abuse of discretion and that the injunction should be affirmed.

I

This case arises out of the agricultural strikes in the Salinas Valley in 1979—strikes marked by numerous incidents of violence. In January 1979, after the breakdown of collective bargaining negotiations over a successor contract, UFW struck a number of growers including Coastal. In response to the strike, the growers hired replacement workers. On February 16, 1979, Coastal filed an unfair labor practice charge with the Agricultural Labor Relations Board (ALRB) alleging that strikers

had unlawfully entered the company's fields, threatened the nonstriking employees, and forced them to leave work. Coastal also alleged that UFW and its agents destroyed irrigation machinery and threw rocks at company vehicles. UFW also filed a charge, claiming that a Coastal employee had brandished a handgun at the strikers in a threatening manner.

After investigation, the ALRB filed unfair labor practice complaints under Labor Code section 1160.2 against UFW as well as Coastal. Pursuant to Labor Code section 1160.4, the ALRB asked the superior court of Monterey County for a temporary restraining order (TRO). The proposed TRO enjoined the UFW from coercing, restraining or assaulting Coastal's employees through acts or threats of violence, limited to 75 the number of pickets permitted at each location, barred all conduct within a specified distance from Coastal's gates while the premises were in use, and enjoined a variety of other activities such as brandishing weapons and interfering with Coastal's activities. The proposed order flatly prohibited UFW from "trespassing upon the property of the employer."

At the initial hearing on the TRO on February 23, 1979, Judge Silver adopted the ALRB's language, but expanded the number of pickets permitted at each location to 150. He also indicated that he would be disposed to grant the strikers some limited access to Coastal's land to communicate with nonstriking employees. Nevertheless, the initial TRO was issued without access provisions.

At a hearing on the access issue, held four days later, the ALRB representative indicated that although the ALRB—as distinguished from its general counsel—had not yet decided if strike access was a protected right, he was authorized by the general counsel's office to request that access be permitted. The ALRB proposed language based on California Administrative Code, title 8, section 20900, permitting union representatives to enter the employer's property for one hour before and after work and a period not to exceed one hour during the employees' lunch break. Under the proposed order, access was limited to 2 representatives for each crew of no more than 30 workers and an additional representative for every 15 additional workers. The union was required to provide the names of access takers 48 hours in advance.

Judge Silver amended the TRO to include this language but expressly noted that the destruction of crops would not be tolerated, that

access would have to be closely monitored, and that it could be suspended if violent incidents occurred. Additional proceedings clarifying and modifying the TRO were held on March 2, March 16, and March 27. The preliminary injunction under review, which contained the access provisions, was issued on March 29, 1979.[1] Minor amendments to the injunction were adopted on March 30, May 4 and July 3.

## II

██ ██ ██ ██ The sole issue is: Was the trial court's grant of strike access[2] an abuse of discretion? Coastal contends that the trial

---

[1]The access provisions of the preliminary injunction, were as follows: "IT IS HEREBY ORDERED that defendant labor organization, its officers, agents, members, employees, pickets and representatives . . . are hereby enjoined and commanded to desist and refrain from . . . (h) Entering upon or trespassing upon the property of the employer; provided, however, that: [¶] (1) Union representatives may enter the property of an employer for a total period of one hour before the start of work and one hour after the completion of work to meet and talk with employees in areas in which employees congregate before and after working including labor camps. Such areas shall also include buses provided by an employer or by a labor contractor in which employees ride to and from work, while such buses are parked at sites at which employees are picked up or delivered to work. Where employees board such buses more than one hour before the start of work, representatives may have access to such buses from the time when employees begin to board until such time as the bus departs. [¶] (2) In addition, union representatives may enter the employer's property for a single period not to exceed one hour during the working day for the purpose of meeting and talking with employees during their lunch period, at such location or locations as the employees eat their lunch, except that union representatives may not enter any fields except for the headlands thereof. If there is an established lunch break, the one-hour period shall encompass such lunch break. If there is no established lunch break, the one-hour period shall encompass the time when employees are actually taking their lunch break, whenever that occurs during the day. Union representatives shall have access prior to and after the lunch period to enable them to be present and talk to the employees throughout the entire lunch period. [¶] (3) Numbers of representatives; identification; prohibited conduct. [¶] (a) Access shall be limited to two representatives for each work crew on the property, provided that if there are more than 30 workers in a crew, there may be one additional representative for every 15 (fifteen) additional workers. In the case of a single worker, only one union representative may take access. [¶] (b) Upon request, representatives shall identify themselves by name and labor organization to the employer or law enforcement officials or their agents. Representatives shall also wear a badge which clearly states his or her name, and the name of the organization which the representative represents. [¶] (c) Defendant labor organization shall provide to the employer, law enforcement officials, and the ALRB a written list of those persons taking access. Such list shall be given within forty-eight (48) hours of the signing of this Order and within forty-eight (48) hours of any modification of said list. [¶] (d) The right of access shall not include conduct disruptive of the employer's property or agricultural operations, including injury to crops or machinery or interference with the process of boarding buses. Speech by itself shall not be considered disruptive conduct."

[2]The ALRB and UFW contend that the trial court did not order Coastal to permit access, but simply declined to bar all access. This claim is based on the fact that the

court's decision to permit access, which was based on the ALRB general counsel's apparent theory that a right to strike access existed under the Agricultural Labor Relations Act (ALRA), constituted an abuse of discretion because, before permitting exercise of that right, the ALRB was required to adopt a valid rule or regulation respecting access, and could not proceed by adjudication on a case-by-case basis. We disagree and affirm the trial court's order.

At the outset, it is important to note that we do not here consider the ultimate power of the ALRB to permit—by adjudication or rule-making—union access to the employer's property in order to talk to nonstriking workers during an economic strike. The true focus of this case is on the power of the trial court, in granting a TRO or preliminary injunction restraining certain union activities, to permit limited union access. The issue, in short, is one of trial court power, not agency power.

The superior court recognized, and it is generally conceded, that at the time it issued the TRO no ALRB rule or adjudication had dealt with the precise form of access permitted here.[3] However, the ALRB

access provisions of the injunction modify language directed at the union which would otherwise have barred all access. However, the record suggests that the parties and Judge Silver all understood the injunction to require Coastal to permit access.

Based on their interpretation of the trial court's order, the UFW and ALRB also argue that Coastal lacks standing to appeal. Their contention is based on the principle that, in an unfair labor practice case, a charging party is not a party litigant when the board initiates a suit for injunctive relief. (*Squillacote* v. *International U., United A., A. & A.I.W.* (E.D.Wis. 1974) 383 F.Supp. 491.) However, since we understand the trial court's order as directing Coastal to permit access, there can be little question that Coastal is an aggrieved party, and, as such, has standing to appeal. (Code Civ. Proc., § 902; *County of Alameda* v. *Carleson* (1971) 5 Cal.3d 730, 737 [97 Cal.Rptr. 385, 488 P.2d 953].)

[3]The ALRB's representative at the hearing noted: "So we come to the current situation where there is no precedent under NLRB for allowing access in a strike setting. The general counsel is well aware of this position, the fact there is no precedent.... [W]e are going into uncharted territory...."

At about the time we granted a hearing in this case, the ALRB decided in *Bruce Church, Inc.* (1981) 7 A.L.R.B. No. 20, that an employer's denial of strike access is an unfair labor practice when the union has no effective alternative means of communicating with nonstrikers. The ALRB ruled that, in such situations, a striking union has the right to access for one hour at lunchtime. Explaining its decision, the ALRB noted: "The ALRA was created so that nonviolent forms of dispute resolution would replace violent confrontation on California farms. We believe that where strike picketing is inadequate as a form of communication, it tends to fan frustration and tensions, and to increase the potential for violence .... [We] believe that expanded opportunities to communicate on a personal basis which are afforded by strike access, promote rationality between the parties, and help to reduce frustration and tensions which arise when picketing is inadequate." (*Id.*, at p. 3.)

Although *Bruce Church, Inc.* also involved strike access, our decision in this case has no direct bearing on the ALRB's determination that failure to permit strike access may

had ruled in two closely related contexts: organizational access and postcertification access.[4]

Organizational access entails union organizers' entering an employer's property for the purpose of "meeting and talking with employees and soliciting their support" before a union certification vote is taken. (Cal. Admin. Code, tit. 8, § 20900, subd. (e).) Unlike the NLRB, which permits organizational access on a case-by-case basis depending on whether alternative means of organizational communication exist, the ALRB chose to deal with this issue by exercising its rule-making powers. The ALRB determined that because in the agricultural setting alternative means of communication for the purposes of organizing are never adequate (Cal. Admin. Code, tit. 8, § 20900, subd. (c); see also *Tex-Cal Land Mgmt.* (1977) 3 A.L.R.B. No. 14, at p. 16), denial of organizational access constitutes an unfair labor practice. The ALRB adopted regulations defining the parameters of reasonable organizational access. (Cal. Admin. Code, tit. 8, §§ 20900-20901.) We upheld the validity of these regulations in *Agricultural Labor Relations Bd.* v. *Superior Court* (1976) 16 Cal.3d 392 [128 Cal.Rptr. 183, 546 P.2d 687].

In contrast to its treatment of organizational access, the ALRB determined that postcertification access *may* be protected, depending on the availability of other means of communication. (*O.P. Murphy Co., supra*, 4 A.L.R.B. No. 106.) In *O.P. Murphy Co.*, the ALRB recognized that the need for postcertification access springs from a different source than organizational access—that it is based on the right and duty of the exclusive representative to bargain collectively on behalf of all employees it represents. (4 A.L.R.B. No. 106 at p. 3.) While indicating that it will "start with the presumption that no alternative channels of effective communication exist," the board stated that, "[b]ecause of the different interest involved after certification, and because of our limited experience with the effect of post-certification access on the ne-

---

constitute an unfair labor practice in certain situations. As noted, the only issue here is whether the trial court abused its discretion by ordering this form of access—not whether failure to permit strike access may be an unfair labor practice.

[4]Strike access is, of course, one form of postcertification access. Such access may, however, serve other purposes. For instance, in *O.P. Murphy Co.* (1978) 4 A.L.R.B. No. 106, access was permitted to communicate with unit employees "during the course of negotiations, in order to determine their wishes with respect to contract terms and proposals, to obtain current information about their working conditions, to form and consult with an employee negotiating committee, and to keep them advised of progress and developments in the negotiations." (*Id.*, at pp. 3-4.)

gotiating process, we will evaluate the extent of the need for such access on a case-by-case approach." (*Id.*, at p. 8.)

The trial court's authority for the TRO and preliminary injunction issued here was Labor Code section 1160.4, which states in relevant part: "The board shall have power, upon issuance of a complaint as provided in Section 1160.2 charging that any person has engaged ... in an unfair labor practice, to petition the superior court ... for appropriate temporary relief or restraining order ... [T]he court shall have jurisdiction to grant to the board such temporary relief or restraining order as the *court* deems just and proper." (Italics added.) Nevertheless, Coastal argues that, in the absence of an express rule promulgated by the ALRB under its rule-making powers, the trial court's order granting limited strike access was an abuse of discretion.

The argument made by Coastal is not new to California courts. In fact, it is identical to that made by Coastal in a previous case, *California Coastal Farms* v. *Agricultural Labor Relations Bd.* (1980) 111 Cal.App.3d 734 [168 Cal.Rptr. 838]. (*Coastal I.*) That case, like the current one, arose out of unfair labor practice proceedings filed by the ALRB against the union for improper conduct of its members. The ALRB then sought an injunction that would limit, but not totally prohibit, strikers from picketing the residences of nonstriking workers. Coastal petitioned for mandate to compel the ALRB to adopt rules governing residential picketing, arguing that when the ALRB laid down conditions for such picketing, it was adopting rules and standards without complying with the procedural requirements of Labor Code section 1144.[5] Coastal makes the same argument here, with regard to strike access.

The *Coastal I* court rejected Coastal's argument noting, "The use of the permissive 'may' rather than 'shall' in section 1144 makes it clear that the statute merely confers an additional power upon the Board and authorizes it, in its discretion, to adopt such rules and regulations as it deems necessary. We find nothing in the language of the statute which supports plaintiff's contention that the Board *must* control picketing, or

---

[5]Section 1144 states: "The board *may* from time to time make, amend, and rescind, in the manner prescribed in Chapter 4.5 (commencing with Section 11371) of Part 1 of Division 3 of Title 2 of the Government Code, such rules and regulations as may be necessary to carry out the provisions of this part." (Italics added.) Government Code section 11371, subdivision (b) (now § 11342, subd. (b)) defines a regulation as "every rule, regulation, order, or standard of general application ...."

any other unfair labor practice, through rules and regulations of general application, rather than by dealing with the problem on a case-by-case basis. It is apparent that the two remedies are independently available to the Board and that it is the Board which is vested with the authority to determine which remedy is most appropriate in a given situation. [Citation omitted.]" (*Coastal I, supra*, at pp. 738-739.)

As this court noted in *Agricultural Labor Relations Bd*. v. *Superior Court, supra*, 16 Cal.3d 392, 413, it is a well settled principle of administrative law that "in discharging its delegated responsibilities the choice between proceeding by general rule or by ad hoc adjudication 'lies primarily in the informed discretion of the administrative agency.' (*Securities Comm'n* v. *Chenery Corp*. (1947) 332 U.S. 194, 203 [91 L.Ed. 1995, 2002, 67 S.Ct. 1575]; [additional citations omitted].)" This rule applies equally to the NLRB (see, e.g., *NLRB* v. *Bell Aerospace Co*. (1974) 416 U.S. 267, 294 [40 L.Ed.2d 134, 153-154, 94 S.Ct. 1757]) which, despite the fact that it is empowered to make rules in much the same way as the ALRB, has consistently opted to develop substantive policies through adjudication. (*NLRB* v. *Wyman-Gordon Co*. (1969) 394 U.S. 759, 765, fn. 3 [22 L.Ed.2d 709, 714, 89 S.Ct. 1426].)

Some commentators and courts have criticized the NLRB, as appellants here criticize the ALRB, for its use of adjudication rather than rulemaking. (See, e.g., *NLRB* v. *Wyman-Gordon Co., supra*, 394 U.S. 759, 775 [22 L.Ed.2d 709, 720] (dis. opn. by Douglas, J.); Bernstein, *The NLRB's Adjudication-Rule Making Dilemma Under the Administrative Procedure Act* (1970) 79 Yale L.J. 571; Peck, *The Atrophied Rule-Making Powers of the National Labor Relations Board* (1961) 70 Yale L.J. 729; but see Note, *NLRB Rulemaking: Political Reality Versus Procedural Fairness* (1980) 89 Yale L.J. 982; cf. 2 Davis, Administrative Law Treatise (2d ed. 1979) § 7.25, p. 118.) These criticisms have generally focused on the use of adjudication to develop rules of general application.[6] However, as noted, in this case the ALRB made clear that it had *not* decided whether the right of access could apply in all cases—or even if it existed. Acting under Labor Code section 1160.4, the board was merely attempting to find a temporary judicial

---

[6]For example, Professor Peck notes, "The [NLRB] has clearly abandoned the quasi-judicial approach, and has engaged in substantive rule-making with respect to the standards governing the exercise of its jurisdiction. It likewise adopted substantive rule-making as the means of promulgating its revised contract bar doctrine .... [T]he *sub rosa* formulation of rules in the guise of ad hoc decisions is eloquent testimony to the necessity of utilizing rule-making powers for effective discharge of the Board's obligations." (70 Yale L.J. (1961) 729, 752-753.)

remedy for a potentially volatile situation where lack of access was a major cause of growing tensions.

This case was, in fact, particularly suited to the use of adjudication —judicial or administrative. Strike access was a new concept—one with which the ALRB had no experience. By proceeding through adjudication, the ALRB should be better able to develop a policy that encourages communication and reduces violence. As the United States Supreme Court has recently noted in a related context: "The use by an administrative agency of the evolutional approach is particularly fitting .... "'Cumulative experience" begets understanding and insight by which judgments ... are validated or qualified or invalidated.'" (*NLRB* v. *Weingarten, Inc.* (1975) 420 U.S. 251, 265 [43 L.Ed.2d 171, 182, 95 S.Ct. 959].) In view of the danger of violence that is so frequently present in the agricultural context (see Note, *ALRB* v. *Superior Court: Access to the Fields—Sowing the Seeds of Farm Labor Peace* (1977) 7 Golden Gate L.Rev. 709, 710, fn. 3), such a cautious approach is commendable.

### III

More fundamentally, Coastal's arguments reflect a misconception of the role of the ALRB in these proceedings. Under Labor Code section 1160.4, the court is not bound by the recommendation of the ALRB but, rather, retains discretion to issue any order that is "just and proper" under the circumstances. Although the agency's judgment is entitled to deference in light of its expertise, it is only one of several guideposts. "The court may properly consider any fact relevant to the question whether the requested relief is just and proper, including the nature of the alleged unfair labor practice (i.e., whether it is violent, coercive, etc., and whether it is ongoing or consisted of a single act), its probable effect in relation to the status quo and the statutory objectives, the nature of the relief sought, the timing of the request, the circumstances of the parties, and the probable effects upon them of the order requested. [Citations omitted.]" (*Agricultural Labor Relations Bd.* v. *Laflin & Laflin* (1979) 89 Cal.App.3d 651, 679 [152 Cal.Rptr. 800].)[7]

---

[7]The trial court clearly recognized these principles, noting: "[I]f I am going to enforce a restraining order, I am not going to be dependent upon what the Board determines to be appropriate or not appropriate. I am going to enforce it in terms of what orders I felt were appropriate [*sic*] .... I have no power, nor would I have any jurisdiction to issue such an order out of the context as indicated here. Where you ask with one hand to take away certain rights, you have to with the other hand take into consideration what rights you are taking away from those people, and if necessary, you have to balance."

■■ ■■■ In determining whether relief is proper under section 1160.4, the trial court must make a two-part determination: "[F]irst, that there is reasonable cause to believe that the Act has been violated;[8] and second, that injunctive relief is reasonably necessary to preserve the status quo or to prevent frustration of the basic remedial purposes of the Act. [Citations omitted.]" (*Solien v. Merchants Home Delivery Service, Inc.* (8th Cir. 1977) 557 F.2d 622, 626; see also *Agricultural Labor Relations Bd.* v. *Ruline Nursery Co., supra*, 115 Cal.App.3d 1005, 1012.)[9] It must consider whether there is a probability that the purposes of the ALRA will be frustrated unless temporary relief is granted or the circumstances of a case create a reasonable apprehension that the efficacy of the ALRB's final order may be nullified, or the administrative procedures will be rendered meaningless. (*Agricultural Labor Relations Bd.* v. *Ruline Nursery Co., supra*, 115 Cal.App.3d at p. 1015; *Angle* v. *Sacks* (10th Cir. 1967) 382 F.2d 655, 660.)

■ In this case, the superior court's decision not to bar all strike access was clearly related to a major purpose of the ALRA—to "ensure peace in the agricultural fields . . ." (Stats. 1975, Third Ex. Sess., ch. 1, § 1, p. 4013.) The case arose, in large part, from Coastal's concern over

---

[8]"[T]he *reasonable cause* aspect of the two-pronged test is met if the ALRB's theory is neither *insubstantial* nor *frivolous*. [Citation omitted.]" (*Agricultural Labor Relations Bd.* v. *Ruline Nursery Co.* (1981) 115 Cal.App.3d 1005, 1013 [171 Cal.Rptr. 793]; *Boire* v. *Pilot Freight Carriers, Inc.* (5th Cir. 1975) 515 F.2d 1185, 1189, cert. den. (1976) 426 U.S. 934 [49 L.Ed.2d 385, 96 S.Ct. 2646].) On appeal, we consider only whether the superior court's finding in this regard was "clear error." (*Agricultural Labor Relations Bd.* v. *Ruline Nursery Co., supra*, at p. 1013.)

None of the parties appears to contest the fact that the first prong of the test was met. However, Coastal argues that granting strike access was improper in this case because it was not charged with an unfair labor practice in connection with the denial of access. Such a charge was not required. Unfair labor practice charges had been filed against both Coastal and UFW, and both were parties to the injunction proceedings. The determination of the proper scope and form of relief was clearly within the discretion of the court. The cases discussed do not suggest that relief must, in all cases, be limited to redress of the specific complaint alleged.

Here, the court went a long way toward granting Coastal the relief it desired. The limitations it placed on union activity clearly restricted some rights that union members would otherwise have had and, in fact, went beyond the specific unfair labor practices charged by limiting the number and location of pickets. Permitting limited access was a proper attempt to strike a balance, and to deal effectively with the underlying causes of the unfair labor practices charged.

[9]Labor Code section 1148 states in relevant part: "The [ALRB] shall follow applicable precedents of the National Labor Relations Act, as amended." Section 1160.4 was derived fron NLRA section 10(j) (29 U.S.C. § 160(j); *Agricultural Labor Relations Bd.* v. *Laflin & Laflin, supra*, 89 Cal.App.3d at page 665, to which the above test has been applied.

the fact that strikers were running into the fields to communicate with nonstrikers.[10] It had asked the court to bar all access—a suggestion that Judge Silver believed could only enhance the danger of serious violence. The court's solution, to allow strictly limited access with the express condition that all access could be terminated if violent incidents occurred, was well calculated to encourage maximum dialogue between the strikers and nonstrikers while reducing the danger of violence.

The court's belief that access would reduce the level of violence was apparently correct. According to Captain Scott, who was in charge of the Monterey County Sheriff's Department strike detail, a reduction in violence actually occurred. Scott testified that during the initial month in which Judge Silver's TRO permitting access was in effect, no violent incidents had occurred during access taking, the number of arrests had been reduced, rushing into the fields had subsided, only four rock-throwing incidents had been reported, and the number of police assigned to cover the strikers had been reduced. Although Captain Scott felt that the overall level of tension continued to increase, the court attributed the increase to the length of the strike and the approach of the harvest.

In exercising its discretion, the trial court properly attempted to strike a balance, protecting the rights of Coastal and the nonstrikers while protecting the "presumptively protected status of peaceful picketing activities...." (*Kaplan's Fruit & Produce Co.* v. *Superior Court* (1979) 26 Cal.3d 60, 81 [162 Cal.Rptr. 745, 603 P.2d 1341]; *United Farm Workers of America* v. *Superior Court* (1976) 16 Cal.3d 499, 505 [128 Cal.Rptr. 209, 546 P.2d 713].) As we noted in *Kaplan's*, courts "'should be cautious in entertaining actions to enjoin or restrain [peaceful picketing activities]' (*United Farm Workers of America* v. *Superior Court, supra*, 16 Cal.3d 499, 505); injunctions should 'be couched in the narrowest terms that will accomplish the pin-pointed objective permitted by constitutional mandate and the essential needs of the public order' (*id.*, at p. 504). Because temporary restraining orders

---

[10] Judge Silver noted: "[I]t's obvious that access has been ... central to the violence that has been caused here and in the Imperial Valley, because, if you read the declarations, the central problem that arises is the entering of the fields by the strikers for purposes of talking or communicating their position, sometimes too forcefully.... [A]ccess for purposes of communication is, in fact, an issue we are involved with and is the issue which has resulted in the violent conduct of the past. [¶] So what has been asked is to totally eliminate that right of communication and in essence make this court a catalyst ... of further violent conduct on the part of both sides."

and preliminary injunctions in labor disputes may often have the effect of determining and terminating the entire controversy (see *McKay* v. *Retail. Auto. S. L. Union No. 1067* (1940) 16 Cal.2d 311, 330 [106 P.2d 373]; *United Farm Workers of America* v. *Superior Court* (1975) 14 Cal.3d 902, 913 [122 Cal.Rptr. 877, 537 P.2d 1237]), 'judicially imposed restraints . . . must be tailored with caution and precision, and be reserved for those cases in which the threat of harm seems clear and imminent' (*United Farm Workers of America* v. *Superior Court, supra*, 16 Cal.3d 499, 506.)." (*Kaplan's Fruit & Produce Co.* v. *Superior Court, supra*, 26 Cal.3d at p. 81.)

Here Coastal's property rights were protected by the terms of the injunction preventing strikers from damaging its crops, vehicles, machinery or equipment; restricting the total number of pickets on each site to 150; requiring that they maintain a distance from the company's property and gates; and preventing the union members from brandishing weapons. In addition, access was limited to 2 representatives for every 30 in a crew, the periods and place of permitted entry were strictly limited, and the union was required to provide lists of all persons taking access 48 hours in advance. These provisions adequately protected the grower's property interests.

The nonstrikers had two conflicting interests. First, they had the right to refrain from concerted activities, a right that is, of course, protected by section 1152 of the Labor Code. The superior court sought to accommodate this right by (1) limiting access to the "headlands" of the fields so that nonstrikers could choose to avoid the union representatives by lunching in the field, (2) regulating access to the labor camps where many of the nonstrikers lived, (3) restricting the number of organizers entering the fields to avoid a coercive atmosphere, and (4) requiring noncoercive interaction between strikers and nonstrikers as a condition of continued access.

The nonstrikers also had the right to be informed about the issues of the strike. Permitting limited access was, of course, consistent with and in furtherance of that right.

Balanced against these interests were the rights of the strikers—in particular, the right to strike, and the right to inform the public and parties effectively concerning the issues in a labor dispute.[11] In weighing

---

[11] In determining the extent of the striker's right to communicate, the superior court relied, in part, on *Hudgens* v. *NLRB* (1976) 424 U.S. 507 [47 L.Ed.2d 196, 96 S.Ct.

these considerations, the court also considered the presumption that in agricultural settings alternative means of communication are not available[12] and observed that means of communication available in other contexts, such as employee address lists, were precluded in this context because of the danger of violence. In view of these considerations, the balance struck by the trial court seems more than fair to the employer and clearly not an abuse of discretion.[13]

The order is affirmed.

Broussard, Acting C. J., Mosk, J., Newman, J., and Racanelli, J.,* concurred.

---

1029] and *Scott Hudgens* (1977) 230 N.L.R.B. 414, the same case on remand. The issue in *Hudgens* was the right of striking warehouse employees to enter a privately owned shopping center and interior mall and picket to communicate their position to shoppers and nonstriking workers. The target store was one of sixty in the complex and could only be reached from an interior mall owned and operated by the shopping center. When the manager of the shopping center threw the pickets out, the union filed an unfair labor practice charge with the NLRB. Remanding the case to the NLRB, the United States Supreme Court noted: "The *Babcock & Wilcox* opinion [(1956) 351 U.S. 105 [100 L.Ed. 975, 76 S.Ct. 679]] established the basic objective under the Act: accommodation of § 7 rights and private property rights 'with as little destruction of one as is consistent with the maintenance of the other.' [Fn. omitted.] The locus of that accommodation, however, may fall at differing points along the spectrum depending on the nature and strength of the respective § 7 rights and private property rights asserted in any given context. In each generic situation, the primary responsibility for making this accommodation must rest with the Board in the first instance." (424 U.S. at p. 522 [47 L.Ed.2d at pp. 208-209].) On remand, the NLRB held that in a strike context, no less than in an organizational context, the right to access for the purpose of communication exists. The NLRB noted, "[I]t is fully recognized by Board and Court precedent [fn. omitted] ... that both ... [economic strike and organizational] activity are protected by section 7. Accordingly, economic activity deserves at least equal deference [fn. omitted], and the fact that the picketing here was in support of an economic strike does not warrant denying it the same measure of protection afforded to organizational picketing." (95 L.R.R.M. at. p. 1353; see also, *Seattle-First National Bank* (1979) 243 N.L.R.B. 898 [101 L.R.R.M. 1537]; *Holland Rantos Co.* (1978) 234 N.L.R.B. 726 [97 L.R.R.M. 1376].)

[12]California Administrative Code, title 8, sections 20900-20901; *Agricultural Labor Relations Bd.* v. *Superior Court, supra*, 16 Cal.3d at pages 414-415.

[13]Coastal also raises a constitutional argument against court-ordered access. Since, for present purposes, we can see no meaningful distinction between access for organizational purposes and access to discuss issues during an economic strike, we simply point to the fact that we decided this issue in *Agricultural Labor Relations Bd.* v. *Superior Court, supra*, 16 Cal.3d 392. The fact that Coastal reargues the matter under the "privacy" label, adds nothing to the substantive merits of its position.

*Assigned by the Acting Chairperson of the Judicial Council.

**RICHARDSON, J.**—I respectfully dissent.

The majority affirms the trial court's order granting to *striking* farm workers and their union representatives direct access to a grower's property, despite the absence of any formal rule or regulation by the Agricultural Labor Relations Board (ALRB) authorizing such entry or specifying the guidelines and conditions precedent thereto. The majority argues that allowance of strike access "was clearly related to a major purpose of the ALRA—to 'ensure peace in the agricultural fields ....' [Citation.]" (*Ante*, p. 480.) I wholly disagree, believing that to allow such a direct confrontation between strikers and growers without the benefit of any definitive ALRB regulations, which have been adopted following industry-wide hearings and negotiations between adverse parties, is most calculated to ensure strife rather than peace in the fields. This strike arose from farm labor disputes which, in the words of the majority, had been "marked by numerous incidents of violence." (*Ante*, p. 472.) In light of the history of violence which has been experienced during similar confrontations when there are no guidelines, the encouragement of such access during a strike impresses me as most unwise. In my view, the trial court abused its discretion in doing so.

The majority quotes in part from a legislative preamble to the Agricultural Labor Relations Act (ALRA; Lab. Code, § 1140 et seq.), but fails to refer to the following portion of that same preamble: "This enactment is intended *to bring certainty and a sense of fair play to a presently unstable and potentially volatile condition* in the state." (Italics added; see Note in Deerings Ann. Lab. Code (1976 ed.) foll. § 1140.) Thus, in the Legislature's view, with which I fully concur, farm labor peace is best achieved through establishment of *rules of law* which provide certainty and fairness in an otherwise "unstable and potentially volatile" industry. Is this certainty, fairness, and stability better achieved by case-by-case, piecemeal adjudication or by the enforcement of administrative rules negotiated after full, industry-wide hearings?

The ALRA, of course, contains no provisions governing strike access. Instead, the ALRA delegates to the ALRB the task of formulating rules and regulations "necessary to carry out" the ALRA's policies. (Lab. Code, § 1144.) With particular reference to access rights, in 1975, the ALRB promulgated regulations which granted a qualified right of *preelection access* to growers' premises by farm labor organizers for purposes of meeting and talking with farm workers. (Cal. Admin. Code, tit. 8, pt. II, ch. 9, §§ 20900-20901, pp. 1051-1053.) These regulations contain elaborate guidelines, restrictions and condi-

tions limiting the right of access and the time, place and manner of entry. In the course of adopting these regulations, the ALRB itself expressly found that: "*The legislatively declared purpose of bringing certainty and a sense of fair play* to a presently unstable and potentially volatile condition in the agricultural fields of California *can best be served by the adoption of rules on access which provide clarity and predictability to all parties. Relegation of the issues to case-by-case adjudication or the adoption of an overly general rule would cause further uncertainty and instability* and create delay in the final determination of elections." (§ 20900, subd. (d), italics added.)

In approving the foregoing principle we accepted the ALRB's administrative access regulations, based in part upon the foregoing ALRB finding that labor peace can best be served by the adoption of detailed rules and regulations rather than case-by-case confrontation. (*Agricultural Labor Relations Bd.* v. *Superior Court* (1976) 16 Cal.3d 392, 416 [128 Cal.Rptr. 183, 546 P.2d 687].) Why, six years later, do we now reverse our position? Nothing has happened in the fields in the ensuing six years which would justify this 180 degree shift in direction. Granting direct access to the grower's property at best is a risk-taking business. During an active strike, when feelings and mutual distrust are high, the danger of violent confrontation is greatly enhanced.

As recently observed by an appellate court in a case involving the ALRB's failure to promulgate regulations before granting the *ALRB's own agents* access to growers' property, "We are not here dealing with a rule of internal administration or a procedural requirement affecting the internal workings of the ALRB, but rather with a rule of access which involves an unconsented invasion, a technical trespass on private property. Such a right is protected by both the state and federal Constitutions. While rights in property are not absolute, nevertheless, any impingement thereon should only be made subject to reasonable limitations.

"Furthermore, the ad hoc disposition or impairment of rights of this magnitude and nature does not further the express purposes of the Act. The ad hoc approach to such an issue may—did—lead to confrontation, to disruption of the labor peace. Thus, one of the prime objectives of the Act is thwarted by an invasion of a property right without the opportunity of hearing and care and preciseness in adjudication of the various factors which are necessary to authorize a limited entry." (*San Diego*

*Nursery Co.* v. *Agricultural Labor Relations Bd.* (1979) 100 Cal.App. 3d 128, 142 [160 Cal.Rptr. 822].) I fully concur in such an analysis.

In my view, the trial court abused its discretion in granting strike access in the absence of some enabling ALRB regulation, formulated after a full notice and hearing to all interested parties in the industry. As noted by the *San Diego Nursery* court, quoting from Justice William O. Douglas' dissent in *NLRB* v. *Wyman-Gordon Co.* (1969) 394 U.S. 759, 777-779 [22 L.Ed.2d 709, 721-722, 89 S.Ct. 1426], "'The rule-making procedure performs important functions. It gives notice to an entire segment of society of those controls or regimentation that is forthcoming. It gives an opportunity for persons affected to be heard . . . .

"'. . . Agencies discover that they are not always repositories of ultimate wisdom; they learn from the suggestions of outsiders and often benefit from that advice . . . .

"'This is a healthy process that helps make a society viable. The multiplication of agencies and their growing power make them more and more remote from the people affected by what they do and make more likely the arbitrary exercise of their powers. Public airing of problems through rule making makes the bureaucracy more responsive to public needs and is an important brake on the growth of absolutism in the regime that now governs all of us. . . .

"'Rule making is no cure-all; but it does force important issues into full public display and in that sense makes for more responsible administrative action.' [Citation.]" (100 Cal.App.3d at pp. 142-143.)

From the foregoing, I conclude that if ALRB rules and regulations are deemed an essential prerequisite to *preelection* access to a grower's property and to *board-agent* access, a fortiori, there is a need for such rules and regulations before permitting *strike* access. The point was very well put by Justice Scott speaking for the majority of the Court of Appeal in this case: "[A]ssuming only for the sake of argument that a limited right to strike access is constitutionally permissible, we see the need to regulate access by rule as even greater during a strike, when increased tension among grower, striker, and nonstriker exacerbates the possibility of violent confrontation." (Fn. omitted.)

The majority misses a golden opportunity to apply principles heretofore approved both by us and by the ALRB in preelection and agency access contexts, to the much more heated and tense atmosphere of an ongoing strike. By following our own precedents not only would we be consistent but, in my view, we would thereby reduce the risks of confrontation which can lead to the flashpoints of violence.

I would reverse the judgment.