[No. A044753. First Dist., Div. Five. Mar. 8, 1990.]

ELAINE MEIN, Plaintiff and Appellant, v.
SAN FRANCISCO BAY CONSERVATION AND DEVELOPMENT
COMMISSION, Defendant and Respondent.

728

**COUNSEL**

Morris & Masino, Richard B. Morris, Frank N. Masino and Julia McDonald for Plaintiff and Appellant.

John K. Van de Kamp, Attorney General, N. Gregory Taylor, Assistant Attorney General, Dennis Eagan and Joseph Barbieri, Deputy Attorneys General, for Defendant and Respondent.

**OPINION**

**LOW, P. J.**—Elaine Mein appeals the denial of her petitions for mandate against the San Francisco Bay Conservation and Development Commission (BCDC). BCDC denied her an after-the-fact permit to fill a portion of the San Francisco Bay (Bay) for a private home, and subsequently issued a cease-and-desist order requiring her to remove all or large portions of the fill. We conclude that substantial evidence supports BCDC's findings that the project did not comply with statutory requirements for Bay fill (Gov.

Code, §§ 66605, 66632)[1] and that there was no abuse of discretion in formulation of the cease-and-desist order's terms and conditions. We therefore affirm.

In 1985 Mein purchased a bayfront parcel on Sandy Beach Road in Vallejo. The property included a storm-damaged house and deck constructed partly on piles over the Bay. In June 1985 Mein replaced 18 deteriorated pilings beneath the old deck; she obtained a permit from Solano County for this construction but none from BCDC.

In November 1985, through her architect and contractor, Alfred Wastlhuber, Mein obtained a Solano County permit to demolish the existing house and deck and build a larger replacement house and deck. The permit contained a written notation, "BCDC permit required by owner." Mein nevertheless commenced construction in April 1986 without any application having been made to BCDC. In September 1986 a BCDC enforcement officer told Mein by letter that a BCDC permit was needed for her construction and that all work should cease until one was obtained. Finishing work nevertheless continued until November, when Mein occupied the house. The completed house and deck rested on substantially increased fill, covering an additional 1,550 square feet of Bay surface.

Mein applied for a permit in January 1987, which the BCDC denied after staff analysis and public hearing. A cease-and-desist order followed.

## I

Preliminarily, Mein contends the trial court should have independently reviewed the BCDC findings rather than relying on substantial evidence, because she had a vested right to rebuild the house. Mein, however, did not repair or rehabilitate the existing structure on her property but demolished it and built a substantially larger deck and house, for which she could claim no vested right. (See *Whaler's Village Club* v. *California Coastal Com.* (1985) 173 Cal.App.3d 240, 253 [220 Cal.Rptr. 2].) Moreover, the McAteer-Petris Act provides a procedure for claiming exemption on ground of vested rights; Mein did not avail herself of that procedure and thus waived any such right. (§§ 66632.1, 66656, subd. (a); *Davis* v. *California Coastal Zone Conservation Com.* (1976) 57 Cal.App.3d 700, 708 [129 Cal.Rptr. 417].) The trial court therefore properly applied the substantial evidence standard to BCDC's factual findings. We independently review BCDC's legal conclusions.

---

[1] All further statutory references are to the Government Code unless otherwise noted.

The McAteer-Petris Act (§ 66600 et seq. [hereafter the Act]) created the BCDC and gave it planning and permitting authority over fill in or on the Bay and land use in a 100-foot-wide shoreline zone. (§§ 66610, 66620, 66632.) "Fill" includes pilings and structures built on pilings. (§ 66632, subd. (a).) BCDC shall grant a permit if the project is either (1) necessary to the public health, safety or welfare of the entire Bay Area, or (2) consistent with the Act and with BCDC's San Francisco Bay Plan (San Francisco Bay Conservation and Development Commission, San Francisco Bay Plan (Jan. 1969) [hereafter Bay Plan]). (§ 66632, subd. (f).) There being no claim that Mein's home was essential to the health or welfare of the region, the question in this case was whether it was consistent with the Act and the Bay Plan.

The Act was intended to prevent further piecemeal filling of the Bay (§ 66601), and pursuant to that goal section 66605 sets out limitations on new fill. Further filling is to be authorized only when its public benefits clearly outweigh its harm, and is additionally limited to three types of uses: water-oriented uses, minor fill for improving shoreline appearance and minor fill for improving public access. The term "water-oriented uses" is not defined, but the Act provides an exemplary list: "ports, water-related industry, airports, bridges, wildlife refuges, water-oriented recreation and public assembly, water intake and discharge lines for desalinization plants and power generating plants requiring large amounts of water for cooling purposes." (§ 66605, subd. (a).) In addition to limiting fill to these three types of land use, section 66605 mandates that fill be allowed only when no alternative upland site is available (subd. (b)) and that the area filled be the minimum necessary to achieve the purpose of the fill (subd. (c)).

BCDC found that Mein's house is not a water-oriented use, that it does not qualify as minor fill for improving shoreline appearance, and that it was not the minimum amount of fill needed for its purpose. Mein contends each of these findings was erroneous.

*Water-oriented Use*

■ BCDC concluded that housing is not a water-oriented use within the meaning of section 66605. It relied on a previously obtained informal opinion letter from the Attorney General (Dec. 29, 1983), which cited the language, purposes and history of the Act and the provisions of the Bay Plan. Mein contends BCDC's position is legally erroneous and constitutes a procedurally defective amendment of the Bay Plan.

Mein argues, first, that BCDC has ignored a distinction between "water-oriented priority land uses" (§ 66611) and "water-oriented uses" (§ 66605);

according to her interpretation, the latter is a broad category and includes housing, although the former may not. This argument is without merit. Section 66611 establishes a procedure by which the BCDC is to adopt and maintain a plan for the *shoreline* zone, setting aside certain areas for "water-oriented priority land uses, as referred to in Section 66602." Section 66602 states the legislative policy in favor of reserving portions of the shoreline for "certain water-oriented land uses" so as to reduce the future need for filling the Bay to accommodate those uses. Section 66605, by contrast, strictly limits the purposes for which *Bay fill* may be approved to "water-oriented uses." Thus section 66605 deals with a part of the BCDC mission distinct and different from that dealt with in sections 66602 and 66611; the latter two sections are simply not relevant to the question of uses for which fill may be approved. In addition, we note that the illustrative lists of water-oriented uses in sections 66602 and 66605 are identical, casting doubt on Mein's claim that they represent two different categories. Finally, even if section 66605 was intended to take in a larger group of uses than section 66602, nothing in those sections shows housing would be included in the broader category.

Second, Mein asserts that the Act and the Bay Plan both state policies in favor of residential development of the Bay. The provisions she cites, however, all refer to development of the *shoreline,* not the Bay itself. (§ 66605.1; Bay Plan, *supra*, Summary: Major Plan Proposal No. 7, p. 3, Other Uses of the Bay and Shoreline, Policy Nos. 1, 3, p. 30.) The contrast between proper uses of the Bay and its shoreline is a pervasive theme of the Act, one section of which refers to planning for "the conservation of the water of the bay and the development of its shoreline." (§ 66603.)

If the Act is to fulfill the legislative purpose of preventing piecemeal filling from gradually eliminating large portions of the Bay surface, fill must be restricted to uses which cannot be practically accommodated on upland sites. Section 66605 implements that policy by direct mandate (subd. (b)) and by the restriction to water-oriented uses (subd. (a)). All the uses in subdivision (a)'s illustrative list, with the possible exception of airports, are functionally dependent on proximity to the water. Housing has no such necessary connection to the Bay. Housing, like a myriad of other land uses, may but need not be built on or near the Bay. An interpretation of section 66605 which included these uses under the rubric of "water-oriented" would make the term meaningless in practice and would frustrate the purposes of the Act.

The Bay Plan, which is endorsed in the Act as the guiding document for Bay planning (§§ 66603, 66632, subd. (f)), makes clear that housing is not

ordinarily a water-oriented use. After extended discussion of water-oriented uses (Bay Plan, *supra*, Water-Related Industry, p. 16, Ports, p. 18, Commercial Fishing, p. 19, Airports, p. 20, Recreation, p. 21, Transportation, p. 25, Salt Ponds and Other Managed Wetlands, p. 25), the Bay Plan considers housing under the title, "Other Uses of the Bay and Shoreline" (at p. 30). In that section it is stated that houseboats are not a water-oriented use. (*Ibid.*) In an earlier discussion of live-aboard boats the Bay Plan also states, "Although *residential use is neither a water-oriented or a public trust use,* live-aboard boats can be converted easily to a navigable, recreational use . . . ." (Bay Plan, *supra*, Recreation, p. 21, italics added.)

BCDC's conclusion that housing is not a water-oriented use is thus in accord with the Act and the Bay Plan. Mein also argues that such an administrative position may not be formulated by means of case-by-case adjudication but must be the subject of formal rulemaking. She cites section 66652, which provides that BCDC may amend the Bay Plan after notice and hearing, and requires 90 days notice of any proposed amendment which "defines a water-oriented use." Her argument fails for two reasons. First, the statute is permissive only: BCDC "may" amend the Bay Plan, but need not do so in order to decide individual applications. (See *Agricultural Labor Relations Bd.* v. *California Coastal Farms, Inc.* (1982) 31 Cal.3d 469, 478 [183 Cal.Rptr. 231, 645 P.2d 739] [well-settled principle of administrative law that agency has discretionary choice between proceeding by rulemaking or adjudication].) Second, as discussed above, the Bay Plan *already* provides that housing is not a water-oriented use. The BCDC conclusion thus cannot be considered an amendment to the Bay Plan, and Mein raises no objection to the manner by which the Bay Plan itself was adopted.

 Finally, Mein argues generally that the BCDC position is an attempt to "extirpate housing from its jurisdictional territory" and that it "effectively precludes residential development on San Francisco Bay." In the Bay Plan, however, BCDC explicitly recognizes that fill may be approved for portions of individual nonwater-oriented projects where such bayward extensions are needed "to enable actual use of the water . . . or to use the Bay as an asset in the design of the structure." (Bay Plan, *supra*, Other Uses of the Bay and Shoreline, Policy No. 2, p. 30.) BCDC has adopted a regulation implementing that policy (Cal. Code Reg., tit. 14, § 10702). BCDC found that Mein's house did not qualify under this regulation, and in this court Mein challenges neither that finding nor the validity of the regulation.

This case does not raise any question concerning repairs to existing housing, or the replacement of one house with another occupying the same Bay

fill. Mein demolished her house and built a substantially larger house on increased fill. BCDC was not asked to issue Mein a permit to repair or rebuild the storm-damaged home, and we do not decide whether BCDC would have been required to issue such a permit.

*Minor Fill for Improving Shoreline Appearance*

■ BCDC's regulation implementing this portion of section 66605, subdivision (a) requires, among other things, that the fill be the minimum necessary to improve shoreline appearance. (Cal. Code Reg., tit. 14, § 10700, subd. (b).) BCDC found that Mein had filled more than the minimum necessary to remedy the unsightful condition of the storm-damaged property. Mein contends that the regulation is unauthorized and that the BCDC's finding was erroneous. Both claims lack merit.

The "minimum necessary" limitation follows directly from section 66605, subdivision (c), which provides that, whatever the purpose of the fill, BCDC should not approve more than the minimum necessary for that purpose. BCDC found Mein's home exceeded the minimum necessary because the shoreline appearance could have been improved by repairing a damaged seawall and building a house similar in scale to the old house and to the surrounding properties. Mein argued that such a house could not have accommodated the large west-facing windows which were used in the new house, a passive solar energy design. BCDC responded that "minimum necessary" does not mean the minimum necessary for the particular size or style desired by the applicant. We agree. Section 66605, subdivision (c) limits the fill to the minimum necessary for its purpose, which here (Mein claims) was to improve shoreline appearance. Solar energy generation is a distinct and different purpose, and Mein points to nothing in the record showing such a design was necessary for rebuilding at this site.

## II

■ In its cease-and-desist order BCDC provided Mein three alternative courses of compliance: (1) removal of the entire house, deck and piles; (2) removal of 1,553 square feet of Bay coverage, whether deck or house, and 1,170 square feet of the house itself, returning the project to the size and coverage of the old house; (3) removal of a two-story portion of the house and specified portions of the deck. Mein contends the conditions were designed to decrease residential use of the Bay, a goal which she argues is not statutorily permitted.

A cease-and-desist order issued by BCDC "may be subject to such terms and conditions as the commission may determine are necessary to insure

compliance with the provisions of this title, including immediate removal of any fill . . . ." (§ 66638, subd. (b).) BCDC was thus authorized to order removal of the entire house and deck. (See *Leslie Salt Co. v. San Francisco Bay Conservation etc. Com.* (1984) 153 Cal.App.3d 605, 617 [200 Cal.Rptr. 575] [BCDC has authority to order landowner to remove fill even when fill was placed on property by another].)

In explaining compliance alternatives (2) and (3), BCDC stated they would reduce the intensity of residential use on the Bay while still allowing Mein to retain some benefit from the construction. BCDC errs in identifying "increased residential use" in itself as a harm to be remedied. The Act focuses on fill as the evil to be avoided. Housing, as a nonwater-oriented use, does not justify filling the Bay, but nowhere does the Act or the Bay Plan disapprove of residential use of existing fill. Conditions (2) and (3) were nonetheless within the scope of BCDC's enforcement discretion, because the administrative record contains substantial evidence and unchallenged findings to the effect that the increased size of the house adversely affected shoreline appearance and Bay views. BCDC did not abuse its discretion in formulating the three compliance alternatives.

The judgment is affirmed.

King, J., and Haning, J., concurred.