[No. A054714. First Dist., Div. Five. Oct. 28, 1992.]

SAVE SAN FRANCISCO BAY ASSOCIATION, Plaintiffs and Appellants, v.
SAN FRANCISCO BAY CONSERVATION AND DEVELOPMENT COMMISSION et al., Defendants and Respondents;
PIER 39 LIMITED PARTNERSHIP et al., Real Parties in Interest.

[No. A054720. First Dist., Div. Five. Oct. 28, 1992.]

CONCERNED FRIENDS OF FISHERMAN'S WHARF et al., Plaintiffs and Appellants, v.
SAN FRANCISCO BAY CONSERVATION AND DEVELOPMENT COMMISSION et al., Defendants and Respondents;
PIER 39 LIMITED PARTNERSHIP et al., Real Parties in Interest.

910

## COUNSEL

Roger Beers, Kathryn Lodato and Sue C. Hestor for Plaintiffs and Appellants.

Louise H. Renne, City Attorney, Melba Yee, Deputy City Attorney, Daniel E. Lungren, Attorney General, Roderick Walston, Chief Assistant Attorney General, Jan S. Stevens, Acting Assistant Attorney General, Dennis Eagan, Ellyn S. Levinson and Joseph J. Barbieri, Deputy Attorneys General, for Defendants and Respondents.

Pettit & Martin, Theodore Russell, John M. Sanger, Robert J. Keyes and Charles R. Olson for Real Parties in Interest.

**OPINION**

HANING, Acting P. J.—In these consolidated appeals we review the administrative approval of the construction of an aquarium known as Underwater World at Pier 39 in the Fisherman's Wharf area of San Francisco. After the City and County of San Francisco (City) and the San Francisco Bay Conservation and Development Commission (BCDC) issued the necessary authorizations permitting construction of the aquarium project, several citizen action groups sought to overturn its approval by petitioning for writs of mandate alleging the City and BCDC failed to comply with the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.) and the McAteer-Petris Act (MPA; Gov. Code, § 66600 et seq.).[1] The trial court denied the petitions. We affirm the trial court's conclusion that the City and BCDC fulfilled their statutory responsibilities and that their factual determinations were supported by substantial evidence.

## I. *Project Description*

The aquarium project, as approved by the City and BCDC, is the construction of an approximately 37,000-square-foot aquarium on existing and new pilings in San Francisco Bay at Pier 39.[2] Pier 39 is an existing commercial recreation complex composed of approximately 198,000 square feet of small-scale retail, restaurant and theater uses, a 351-berth public marina, a waterfront park and a 937-car parking garage.

The proposal to construct the aquarium was sponsored by the Underwater World Limited Partnership, Pier 39 Limited Partnership, and Questar Corporation of New Zealand. Questar manages Kelly Tarlton's Underwater World in Auckland, New Zealand, the prototype for the aquarium. The Port of San Francisco (Port) is the underlying owner of Pier 39 and leases it to the Pier 39 Limited Partnership. The Port was a co-applicant for the aquarium project. Pier 39 will sublease a portion of the pier for the aquarium facility.

Throughout these proceedings it was well known that the aquarium project's sponsors believed the aquarium would be in the best position to attract the tourist market if located in the Fisherman's Wharf district—the heart of the tourist area in San Francisco—and specifically at Pier 39. Measured in terms of visitors and sales volumes, Pier 39 is among the most successful attractions in the country. Eight out of ten tourists to San Francisco visit Fisherman's Wharf, of which close to two-thirds visit Pier 39. By

---

[1]Unless otherwise indicated, all further statutory references are to the Government Code.

[2]As a familiar point of reference, the proposed aquarium would be about one-third the size of the Monterey Bay Aquarium.

contrast, only one in two tourists visits Golden Gate Park. The Pier 39 complex of shops and restaurants drew approximately 11 million visitors in 1989, and it ranks as the Bay Area's most visited tourist attraction, and the third most visited tourist attraction in the United States.[3] Based on these figures, the aquarium project's sponsors anticipate an annual attendance at the aquarium of about 1.25 million people, of whom 85 percent would be at Pier 39 already.

Visitors to the aquarium would travel on a slowly moving walkway through an acrylic tunnel surrounded by a continuous series of tanks. The tanks would contain approximately 2,000 fish species and sea plants indigenous to the Bay Area and Northern California. As visitors progress on the walkway, the environment would reflect the marine life of progressively deeper ocean waters. The aquarium is designed to give the visitor a "deep sea diving experience." The tanks would contain approximately 700,000 gallons of salt water drawn from the bay, with a semiclosed system that allows the aquarium water to be gradually released and replaced while being continuously circulated and filtered.

The aquarium would be constructed on the southeast edge of the existing Pier 39 complex where it meets with the Embarcadero on a site which presently contains portions of an existing amusement facility, a public access way and 18 boat slips in the Pier 39 marina. It would be built on two levels, each surrounded by new public open spaces at the water's edge. A portion of the project would sit on a new concrete platform supported by approximately 24,847 square feet (.5 acres) of new concrete pilings placed in the bay, 47 percent of which would support the aquarium facility itself and 53 percent of which would support public access and other essential services. The creation of a new platform, which must be set on new pilings, is necessary because the existing Pier 39 structure cannot support the weight of the aquarium's tanks.

The aquarium project, as finally approved, would create new, previously unavailable views of the bay, primarily from a viewing deck along the second level of the aquarium (which would be available to the general public as well as aquarium patrons) and several new public viewing areas. The project would create 40,000 feet of new public access areas, informational exhibits about the bay and the ocean, a laboratory for research and use by school and/or environmental groups, and discounted admission for low-income persons. The aquarium project would also employ six to ten full-time

---

[3]This data was included as part of BCDC's staff analysis of the Pier 39 site and is not questioned by the parties. The accuracy of these facts is irrelevant to the issues and plays no part in our opinion.

marine biologists and teachers who would work with aquarium visitors and groups of school children to provide information on the bay and its marine life. All students enrolled in the San Francisco Unified School District would be offered free admission to the aquarium each year through organized educational programs.

## II. *The Administrative Process*

The administrative review of the aquarium project took over four years and was conducted by many agencies, including the City's planning commission, planning department, port commission, art commission and board of supervisors, the Regional Water Quality Control Board, the Bay Area Quality Management District, the United States Army Corps of Engineers and BCDC. The project raised numerous complex issues and generated strong public interest. Nevertheless, approval was eventually forthcoming from every agency involved, each having a slightly different mission and each being subject to its own rules and regulations. Because the issues on appeal generally challenge the review conducted and approvals granted by the City's planning commission and BCDC, we highlight only their actions and conclusions.

After thirty months of review and five public hearings, the planning commission, the lead agency for purposes of environmental review, voted seven to zero to certify the final environmental impact report (EIR) for the aquarium project on July 20, 1989. The EIR, which is in excess of 600 pages, examined the environmental effects that would be generated by the proposed project, including land use and zoning, bay fill, urban design and visual quality, transportation, construction noise, air and water quality, marine biology and geology/topography. The EIR reported that the only significant environmental impacts from the project that could not be eliminated or reduced to an insignificant level by mitigation measures were (1) a reduction of views from public waterfront streets and open space, including the Embarcadero and some sidewalks on Beach Street, and (2) an increase in traffic at certain key intersections during peak hours. The project's sponsors made substantial commitments to extensive mitigation measures to minimize these and other impacts. The planning commission eventually made a finding that the "social, economic, recreational, educational and environmental" benefits of the aquarium project outweighed any unavoidable adverse environmental effects.

As discussed in greater detail in part IV, *post,* the EIR also described four possible alternatives to the proposed project: (1) A no-project alternative; (2)

two different waterfront locations; (3) a project on Pier 39 in its present form; and (4) a nonwaterfront location.

After the planning commission certified the final EIR and approved the project, BCDC formally accepted the project for review.[4] BCDC's review was triggered because, under the MPA, it has planning and permit authority over fill in or on the bay and land use within a 100-foot-wide shoreline band. (§ 66610.) "Fill" includes not only solid fill such as earth, but other substances or materials placed in the water, including "pilings or structures placed on pilings." (§ 66632, subd. (a).) Although it had participated in the preparation of the EIR, BCDC's central role in the review process was to review the project for conformity with the provisions of the MPA, the San Francisco Bay Plan (Bay Plan), and the San Francisco Waterfront Special Area Plan (Special Area Plan). (§ 66632, subd. (f).)[5]

After a review lasting over 30 months and involving 12 public hearings, BCDC approved the aquarium project by a vote of 16 to 5 on September 6, 1990. During the BCDC review process the project was redesigned no less than six times to meet BCDC's mandate that the project provide maximum feasible public access to the bay. These design modifications resulted in almost 21,000 square feet of new public access at Pier 39, a 20 percent reduction in the square footage of the aquarium, the creation of a 40-foot-wide view corridor between the aquarium and the Pier 39 complex, and slightly less fill in the bay.

Extensive findings were adopted by BCDC, including over 43 pages of special conditions. The most important findings for our purposes are that the aquarium project would provide the Bay Area with a unique and innovative educational and family entertainment facility constituting a form of water-related recreation and bay-oriented commercial recreation; that the project's benefits would clearly exceed the detriment caused by any lost water areas; that the project required a waterfront location to fulfill its educational and public purposes; that the project would create the minimum amount of bay fill necessary and would, to the maximum extent feasible, create a permanent shoreline; and that there was no alternative upland location available for the

[4]BCDC regulations provide that BCDC will not accept a major permit application under the MPA until a project has received all discretionary local land-use approvals. (See Cal. Code Regs., tit. 14, § 10310, subd. (f)(1).)

[5]The Bay Plan is the basic document establishing the policies to guide BCDC in administering its responsibilities under the MPA. It was prepared by BCDC and adopted by the Legislature. (§§ 66603, 66651.) The Special Area Plan is designed to apply the policies in the Bay Plan in greater detail to a specific geographic area, in this case the San Francisco waterfront. (Cal. Code Regs., tit. 14, § 11100.)

project's purpose. It was further found that any adverse environmental impacts caused by new pile-supported fill over the bay would be offset by the removal of an equivalent amount of the same type of fill as close as possible to the project's site.

Thereafter, two separate petitions for writs of mandate were filed in the court below challenging the permits and approvals issued by BCDC and the City authorizing construction of the project. Concerned Friends of Fisherman's Wharf and San Francisco Tomorrow filed one action, and Save San Francisco Bay Association filed the other. The cases were ordered consolidated for briefing and hearing, and the trial court denied relief. After separate notices of appeal were filed, we ordered both appeals consolidated. Although separate briefs have been filed addressing separate issues, each group has expressly joined in the arguments of the other. For organizational purposes we have consolidated many of their arguments.

### III. *Standard of Review*

Since hearings were required before both the City and BCDC, the standard of review is set by Code of Civil Procedure section 1094.5. (See Pub. Resources Code, § 21168.) Under subdivision (b) of Code of Civil Procedure section 1094.5, an abuse of discretion is established and a writ of mandate should issue if an agency either failed to proceed in the manner required by law, did not support its decision with adequate findings, or if its findings are not supported by the record. Unless otherwise noted, the issues on appeal were raised in one form or another during the administrative proceedings. (See *Citizens Assn. for Sensible Development of Bishop Area* v. *County of Inyo* (1985) 172 Cal.App.3d 151, 162-163 [217 Cal.Rptr. 893].)

### IV. *EIR's Analysis of Alternative Sites*

The main focus of this case is the selection of Pier 39 as the location for the aquarium project. As appellants bluntly put it: They have "no objection to this kind of 'aquarium' *per se*, but only to its location." In a multifaceted attack, appellants first claim the City failed to draft an EIR which gave both the public and BCDC the environmental information necessary to allow them to consider a reasonable range of alternative locations for the project. Our Supreme Court has recently addressed the standards by which to judge the adequacy of a CEQA-mandated alternatives analysis: "CEQA establishes no categorical legal imperative as to the scope of alternatives to be analyzed in an EIR. Each case must be evaluated on its facts, which in turn must be reviewed in light of the statutory purpose. . . . [A]n EIR for any project subject to CEQA review must consider a reasonable range of alternatives to the project, *or to the location of the project,*

which: (1) offer substantial environmental advantages over the project proposal [citation]; and (2) may be 'feasibly accomplished in a successful manner' considering the economic, environmental, social and technological factors involved. [Citations.]" (*Citizens of Goleta Valley* v. *Board of Supervisors* (1990) 52 Cal.3d 553, 566 [276 Cal.Rptr. 410, 801 P.2d 1161].)
■ With this standard in mind, we review the alternatives analysis in the EIR.

The EIR first contains a brief discussion of the "No Project Alternative," noting it would avoid all adverse environmental impacts.

The second alternative discussed two different locations, and explored locating the project at another San Francisco waterfront site. The first location, to the west of Pier 35, was the project sponsors' initial choice. It would involve constructing an aquarium without enlarging the bulk of the current Pier 39 structure or displacing existing uses within Pier 39. It would, however, displace a planned open space. It would also require nearly twice as many pilings to be driven into the bay than are proposed for the Pier 39 site, so it would not avoid the adverse effects of placing fill in the bay. The second locale, Piers 30-32, is south of the San Francisco-Oakland Bay Bridge, some distance from Fisherman's Wharf, and was included to illustrate how the traffic impact associated with the project could be avoided while still maintaining the project on the San Francisco waterfront. The EIR noted that because this location is somewhat remote, the trips generated to this alternative site would constitute new traffic as opposed to the large number of "linked trips" anticipated at the Pier 39 location, where the vast majority of visitors would be tourists coming to Fisherman's Wharf anyway, and who would simply add a visit to the aquarium on their day's outing. Given the limitations of mass transit to Piers 30-32, most visitors would arrive by car, and an increase in the traffic and parking demands would result. Furthermore, this alternative site would introduce a commercial recreational use into an area which has traditionally been used for maritime/industrial purposes. It was noted that because Piers 30-32 were not designed to support the aquarium tanks, approximately 114 new pilings would have to be driven into the bay to support a new concrete platform.

The third alternative site explores constructing the aquarium on Pier 39 without extending the existing pier further into the bay. This alternative site would require replacing 25,400 square feet of existing occupied space at Pier 39 with the aquarium. It was pointed out that this alternative site would not change the traffic impact associated with the project. However, the impact on views would be lessened because the project would not extend beyond

the existing Pier 39 footprint. This alternative would require the removal of approximately 200 pilings and 22,000 square feet of the existing pier deck, because the existing pilings supporting Pier 39 lack the structural integrity to support the aquarium's heavy fish tanks. The replacement pilings and pier deck would constitute new bay fill; consequently, this alternative would not lessen any impact from bay fill.

The fourth alternative was a nonwaterfront location, the current site of a service station in the Fisherman's Wharf area across the street from Pier 39, and was included to show an alternative without any of the impacts associated with bay fill. This alternative site would not disrupt existing views of the bay. The traffic impacts in the Fisherman's Wharf area would generally be the same except for an increase in pedestrian traffic at the intersection. The cost and disruption of running large pipes and pumps under the Embarcadero to transfer bay water to and from the aquarium tanks was noted as one of the most undesirable aspects of this location. It was also noted that a nonwaterfront location would detract from the desired bay environment which is a primary feature of the proposed project.

Appellants do not challenge the substantive merit of the foregoing EIR analysis. Instead, they claim it is deficient because it fails to describe an alternative site where the project could have a waterfront location without placing any new fill in the bay. They contend that because the City was the lead agency for the project it had a special duty to prepare a document that could be relied upon by BCDC when BCDC conducted its own review. Instead, they claim, this omission in the EIR's alternatives analysis ignored the environmental sensitivity of the proposed location for the project and frustrated BCDC's ability to carry out its mandate to protect the bay from additional fill.

Before considering the merits of this argument, it is important to clarify the relationship between the City, as the lead agency on the project, and BCDC as a responsible agency. CEQA mandates a lead agency to conduct a thorough review of the project in question even though additional review might later be undertaken by other agencies with jurisdiction over specific resources. (See e.g., *Lexington Hills Assn.* v. *State of California* (1988) 200 Cal.App.3d 415, 433-435 [246 Cal.Rptr. 97].) The City conducted its environmental review and certified the final EIR with full realization that BCDC would rely on the alternatives analysis in that document, but also with the realization that BCDC, the agency with ultimate regulatory authority over the bay, would have to conduct its own analysis using its own special expertise, and would reach its own conclusions on whether to approve the

Pier 39 site. (See Cal. Code Regs., tit. 14, §§ 11560, 15096.) In short, the City had a duty to produce a comprehensive alternatives analysis that could be relied upon by BCDC, but BCDC had the ultimate responsibility to interpret and analyze the provisions of the MPA, the Bay Plan, and the Special Area Plan applicable to this project, and to make its own determination on the suitability of the Pier 39 location.

When viewed in this context, the City did not default in its responsibility to the public or to BCDC to consider a full range of alternatives. As we have seen, in *Citizens of Goleta Valley* v. *Board of Supervisors, supra,* 52 Cal.3d 553, the Supreme Court stressed that the range of alternatives to be included in an EIR should focus on those that could "feasibly" attain the basic objectives of the project, and that CEQA does not require the examination of alternatives that are so speculative, contrary to law, or economically catastrophic as to exceed the realm of feasibility. (*Id.,* at p. 565.) This principle is important for this case because the requirements for the aquarium project were very specific and limited in scope (waterfront access, proven attendance base, transportation and parking), which in turn severely limited the "feasible" alternatives.

Appellants correctly note that the EIR's discussion of alternatives did not contain an analysis of an alternative location on the waterfront that would avoid placing fill in the bay. The lack of specificity in this objection is telling. We are asked to presume that a feasible alternative site existed somewhere along the San Francisco waterfront which did not require fill, and that the City did not make a sufficient attempt to find it or, worse yet, found it but then ignored it. The record demonstrates otherwise.

*Goleta Valley* sanctioned an appellate review of the entire administrative record, and not just the EIR itself, to see whether the agency conducted an in-depth consideration of a range of alternative sites. (*Citizens of Goleta Valley* v. *Board of Supervisors, supra,* 52 Cal.3d at p. 569.) The administrative record herein reveals that the City, independently and in consultation with BCDC, made a comprehensive analysis of numerous alternative sites for the project, the vast majority of which were not discussed in the EIR because their advantages and disadvantages did not substantially differ from the five prototypical sites selected for in-depth discussion. The administrative record reveals that the City, as the lead agency, analyzed every alternative site brought to its attention, considered its location and size, its treatment in local land use plans, its environment, and its potential for minimizing or eliminating the adverse impacts associated with the Pier 39 site, including bay fill. Appellants have not pointed to a single location

brought to the City's attention that was disregarded. In short, when judged against a "rule of reason" we are satisfied that the coverage of alternatives served the EIR's informational function and gave BCDC the information it needed to commence its review of the aquarium project. (52 Cal.3d at p. 565.)

## V. *BCDC's Review of Alternative Sites*

■ Although the City's alternatives analysis under CEQA and BCDC's alternatives analysis under the MPA might proceed along a similar track, the two statutory schemes differ in many significant respects. CEQA is more or less a procedural scheme that makes no guarantees that environmental considerations will prevail. (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 393 [253 Cal.Rptr. 426, 764 P.2d 278].) The MPA, with its mandate to prevent "uncoordinated, haphazard filling in San Francisco Bay," is more value-laden and result-oriented. (§ 66601.) Of significance to this case, the requirements for evaluating potential alternatives to a site requiring fill are much more specific and rigorous under the MPA than the alternatives analysis required under CEQA.

The MPA states, in pertinent part: "[F]urther filling of San Francisco Bay . . . should be authorized only when public benefits from fill clearly exceed public detriment from the loss of the water areas and should be limited to water-oriented uses (such as ports, water-related industry, airports, bridges, wildlife refuges, water-oriented recreation and public assembly . . .)[.]" (§ 66605, subd. (a).) Additional fill in the bay "for any purpose" can only be authorized if "no alternative upland location is available for such purpose." (§ 66605, subd. (b).)

The Bay Plan offers some insight into why bay fill may be approved for water-oriented recreation: "The Bay and its shoreline offer particularly important opportunities for recreational development in urban areas where large concentrations of people now live close to the water but are shut off from it. Highest priority should be given to recreational development in these areas, as an important means of helping immediately to relieve urban tensions." In recognition of this priority, the Bay Plan permits bay fill "for purposes providing substantial public benefits if these same benefits could not be achieved equally well without filling. Substantial public benefits are provided by: [¶] . . . [¶] c. Developing new recreational opportunities . . . . [¶] . . . [¶] f. Developing new public access to the Bay and enhancing shoreline appearance . . . through filling limited to Bay-related commercial recreation and public assembly." The Special Area Plan, adopted as an

amendment to the Bay Plan, made a parcel-by-parcel analysis of each site along the San Francisco waterfront with an eye toward determining each site's potential for serving various public needs. The Special Area Plan specifies that permitted uses on new or replacement fill for Pier 39 include maritime, public recreation/open space/public access, commercial recreation and marina uses.

BCDC made a finding that the aquarium project constitutes "water-oriented recreation," which is one of the specified uses for which the Legislature has approved the use of fill. (§ 66605, subd. (a).) BCDC also found that "the project requires a waterfront location to fulfill its educational and public purposes, and that there is no alternative upland location available for the project."

Appellants challenge BCDC's finding that the aquarium project needs a waterfront location. They argue that ". . . BCDC artificially manipulated the definition of the 'purpose' of the Project in order to reach the conclusion that it is a water-related use that 'requires' a waterfront location." Because of BCDC's erroneous finding, appellants argue, the field of alternative sites considered appropriate for the project's purpose was unduly narrowed to those along the waterfront, and other appropriate nonwaterfront locations were never considered.

There is substantial evidence to support BCDC's finding that the aquarium project needed a waterfront location. In BCDC's own words: "The aquarium is wholly limited to salt water fish. Its water supply will be drawn on a daily basis directly from the Bay and filtered to remove impurities with a portion of the filtered water released into the Bay. It will simulate a deep-sea diving experience by taking the public inside and through aquarium tanks where patrons will see and learn about marine life that is indigenous to the Bay and the Northern Pacific Ocean. [The special conditions placed on the aquarium project by BCDC] assure that the focus on the Bay and the nearby Pacific Ocean will remain for so long as the aquarium operates. The aquarium's exhibit area will face the Bay with a wall of tall windows facing the Bay adjacent to an open public deck to create a closeness to the Bay. The aquarium will increase the public's awareness of the Bay and the environment related to the Bay and the oceans. The aquarium building by being located directly over the Bay and oriented to the Bay will significantly enhance this experience and awareness."

Appellants also maintain that BCDC's finding that the project required a waterfront location violated the spirit of this court's decision in *Mein* v. *San*

*Francisco Bay Conservation and Development Commission* (1990) 218 Cal.App.3d 727 [267 Cal.Rptr. 252]. In *Mein,* we had to decide whether a private house and deck was a "water-oriented use" for which fill was authorized under section 66605, subdivision (a). This statute strictly limits the purposes for which bay fill may be approved to "water-oriented uses" and then sets out an illustrative list of such uses—"ports, water-related industry, airports, bridges, wildlife refuges, water-oriented recreation and public assembly . . . ." Because "housing" was not mentioned in the exemplary list of "water-related uses," we had to examine the MPA and the Bay Plan to determine whether housing could be considered a "water-oriented use." In reaching the conclusion that it could not, we observed that the uses mentioned in section 66605, subdivision (a), were those "which cannot be practically accommodated on upland sites" and which, for the most part, are "functionally dependent on proximity to . . . water." (218 Cal.App.3d at p. 733.)

Appellants emphasize the "functionally dependent" language (*Mein* v. *San Francisco Bay Conservation and Development Commission, supra,* 218 Cal.App.3d at p. 733) and argue that unless BCDC can prove that the aquarium is "functionally dependent on proximity to the water," (*ibid.*) no amount of evidence will support its finding that the aquarium needs a waterfront location. They point out that many aquariums, such as Steinhart Aquarium in Golden Gate Park, are built entirely on land, which proves that an aquarium, by its nature, is not functionally dependent on its proximity to the water. Appellants go on to argue that BCDC was not justified in its wholesale dismissal of all nonwaterfront alternatives unless it could prove the aquarium project required a waterfront location in order to function. Appellants read too much into the *Mein* decision.

The discussion in *Mein* relied upon by appellants was never intended to prescribe an all-inclusive, rigid definition of "water-oriented use." Instead, it was attempting to flesh out this ambiguous term to determine whether housing could qualify. The discussion was necessary because "housing" was not specifically mentioned in section 66605's illustrative list of "water-oriented uses" for which bay fill may be permitted. By contrast, in the instant case BCDC found the aquarium project constituted "water-oriented recreation," a use *explicitly included* in the illustrative list of "water-oriented uses" for which bay fill may be approved. Appellants do not seriously challenge this finding. The discussion in *Mein* has no bearing on BCDC's finding that the project needs a waterfront location.

Having determined that BCDC was justified in considering only alternatives along the waterfront, we reach the most difficult issue presented by this

appeal: Was BCDC's finding that there was no alternative upland location available for the project's purpose supported by substantial evidence?[6] This finding embodies one of the statutory requirements for authorizing fill in the bay. "[F]ill in the bay . . . for any purpose should be authorized only when no alternative upland location is available for such purpose." (§ 66605, subd. (b).) Appellants argue that BCDC failed to seriously apply this factor and that its conclusion that no alternative upland location was available for the aquarium project cannot be justified in light of the record. The subdivision at issue specifies no criteria or standards by which BCDC is to evaluate "alternative upland location[s]," and our own research has revealed no case in which a court has dealt with the requirements of this subdivision.

BCDC, the agency entrusted by the Legislature with enforcing the MPA, made findings concerning its obligation to determine whether an alternative upland location was available for the project. We quote these findings at length because of their interpretative significance: "[I]t has also been suggested that [section 66605, subdivision (b)] requires [BCDC] to deny approval of this project if it is physically possible to place the project at an upland or other location, regardless of any other considerations such as cost, logistics, local land use policies, the project's relationship to San Francisco Bay or other factors. [BCDC] finds that such an interpretation is contrary to the intent and purposes of the [MPA]. If carried to its logical conclusion, it would be impossible to authorize any fill for any purpose anywhere in the Bay because it is always physically possible to place a project outside of the Bay if enough money is spent . . . . Such an extreme result is not intended by the [MPA]. This section must be interpreted pragmatically and reasonably and be based on a case-by-case analysis which takes into consideration the physical characteristics of the particular use, the relation of the use to the Bay, the cost of the proposed project and alternatives to it, logistics, local land use policies and other relevant factors." ■ While not binding on the courts, the construction of a statute by an agency charged with responsibility for its implementation is entitled to great deference. (*Dix* v. *Superior Court* (1991) 53 Cal.3d 442, 460 [279 Cal.Rptr. 834, 807 P.2d 1063].)

■ We concur with BCDC's interpretation. By imposing a requirement that alternative upland locations be given preference in the selection process, we cannot believe the Legislature meant that a site meeting the rigorous requirements of the MPA relating to fill has to automatically be discounted simply because the project could theoretically be located at an upland location. The language of the statute itself dispels such a result. The requirement that an alternative upland location be "available for such purpose"

---

[6]The parties agree that an "upland" location is one that does not require fill, not even replacement fill for old piers, or major reconstruction work to existing piers.

signals the Legislature's intention that an alternative upland location be examined to see first, whether the project could feasibly be located there and second, whether the site enhances or impedes the attainment of the project's purpose. If this were not the case, most of the uses specifically mentioned in the Bay Plan as examples of bay-oriented commercial recreation for which some fill can be permitted (restaurants, hotels, specialty shops) could never be approved by BCDC because there would always be an alternative upland location existing somewhere for such uses.

Implicit in BCDC's obligation to review alternative upland sites is a duty to make an adequate compilation of relevant information on the availability of alternative sites, to analyze each of them reasonably with a special view as to how each site satisfies the project's purpose, and perhaps most importantly, not to ignore pertinent data. If an alternative upland site is identified that is available, meets the project's purpose and does not require fill, obviously all sites requiring fill must be categorically rejected. On the other hand, if a full range of suitable alternative upland sites are considered and the reasons for rejecting them are delineated and legitimate, BCDC is entitled to approve a suitable location which requires fill.

Appellants contend that BCDC failed to conduct its own analysis of alternative locations for the aquarium project and more or less "rubber stamped" the City's review of alternatives as contained in the EIR. In other words, appellants claim the BCDC review procedure was an empty exercise designed to rationalize and justify the City's decision to place the aquarium project at Pier 39.

BCDC's findings on alternative upland locations for the project are vulnerable to the type of arguments crafted by appellants. For the most part, the only sites specifically mentioned in BCDC's findings are those considered in the EIR's alternatives analysis—Piers 30-32, 35, 39 and the nonwaterfront location across the street from Pier 39. Nevertheless, there are general findings made by BCDC, supported by the administrative record, that dispel any doubt that numerous alternative sites were considered in BCDC's review.

BCDC made a finding that it had "also considered older existing piers along the waterfront . . . . However, these also would not be able to support the weight of the aquarium tanks, and new fill would be required." This finding no doubt refers to a report from the aquarium project's engineer contained in the administrative record describing engineering constraints posed by the aquarium's huge tanks. He reported that Piers 39, 37, 35, 34

and 30-32 would all require new pilings (which constitute bay fill) if the aquarium were located on any of them. BCDC also made a finding that "evidence suggests that placing the tanks below grade either on ground or in Bay mud would be structurally infeasible because of the tendencies of the tanks to rise when empty." BCDC went on to find that, for this reason, a suggestion that the aquarium project be constructed beneath Waterfront Park between Piers 35 and 39 was "infeasible for structural and economic reasons." These findings are supported by the project engineer's conclusion that if the aquarium was placed at a lower elevation below the shoreline the tanks would pop up and out of the ground when they were drained for maintenance and repair.

BCDC also found that "many upland locations near the waterfront are not available because of existing uses, development plans or planning policies of the City and County of San Francisco." Another BCDC finding makes reference to the City's policy of concentrating tourist-oriented commercial recreation "in the Pier 35 through Fisherman's Wharf area" where visitors already congregate, as opposed to scattering them indiscriminately along the waterfront. In support of these findings the BCDC administrative record contains analysis from a representative of the City's planning department. As set out in the minutes of the meeting, he said "that based on existing City policy, if the aquarium is to be located on the waterfront, [Pier 39] is the only location for it. Piers to the south are in maritime use, Pier 45 is the commercial fishing area, and to the west is the [Golden Gate National Recreation Area]. Pier 35 is the passenger terminal and Pier 9 is to remain maritime and before it can be developed a total design plan must be prepared, and Pier[s] 30-32 [are] still designated for maritime use. In summary, under City policy, the appropriate location is Pier 39 . . . ." Similar analysis was provided by a representative of the City's planning commission. He reported to BCDC that the policy of the City's master plan was "to concentrate the tourist activities and to minimize travelling from various points of attraction." He believed placing the project at Pier 39 "would support the whole notion of Fisherman's Wharf as an aquatic, maritime activity." Similar reasons for rejecting Candlestick Park/Hunters Point appear in the administrative record. These sites, besides not offering the tourist attendance base and parking and traffic infrastructure needed by the project, are subject to City and BCDC planning policies that discourage such commercial development.

These findings are sufficient to assure us that BCDC's analysis of alternative sites was informed and well considered. The record shows that, in general, BCDC's review of alternative sites focused on areas where the

placement of an aquarium would be compatible with the City's planning objectives, especially the master plan's directive that new tourist facilities should be located in areas already devoted to tourism. Looking at land-use designations and local planning policies was a rational and reasonable step in attempting to identify "available" alternative sites. While the avoidance of fill impacts must be given paramount importance, the MPA itself recognizes that local land use planning should be considered. (See § 66631.) We also reject the assertion that BCDC was required to launch a search of alternative sites outside the San Francisco Bay Area in order to find a waterfront site for the aquarium project that would not involve bay fill. It is difficult to attempt to define an ironclad rule governing the scope of BCDC searches for alternative sites every time a project comes before it for review. Each project has unique constraints, which in turn dictate the proper scope of BCDC's alternatives analysis, which is best made on a case-by-case basis. This point is illustrated by the specific and narrow requirements for the aquarium project. BCDC found that this project had to be located on a waterfront site with a proven attendance base that possessed sufficient amenities, such as public transportation and parking, to accommodate a large number of visitors. In the context of this unique project, BCDC was justified in limiting its review of alternative sites to those along the San Francisco waterfront because it was highly unlikely that a broader search would have identified an alternative site which could feasibly accomplish the project's purpose. Having reviewed the massive administrative record in this case, we conclude that substantial evidence supports BCDC's determination that there is no suitable alternative upland location available for the aquarium project.

When the matter was before BCDC, appellants did not champion a particular alternative site discussed in the EIR or identified in the planning process. They merely mounted criticism on the Pier 39 location. They have not pointed to any alternative location that was brought to BCDC's attention that was ignored or rejected for illegitimate reasons. They merely tout the virtues of an unspecified waterfront location that would not require fill. In this four-year, vigorously contested, well-publicized planning process, which generated an administrative record of close to 10,000 pages, it strains belief that there exists an upland site on the seven and one-half mile stretch of the San Francisco waterfront that is available and appropriate for the project's purpose that somehow escaped the attention of appellants, BCDC, the City and the public. As the court noted below: "I must say I certainly have the

impression from this record that the entire waterfront of San Francisco was considered." ██ We get the same impression.[7]

### VI. *Permanent Shoreline*

 The next statutorily mandated BCDC finding challenged by appellants is that the project, to the maximum extent feasible, creates a permanent shoreline. (§ 66605, subd. (f).) In its finding BCDC explained: "[T]he project design and the quality of construction materials to be used will, to the maximum extent feasible, establish a permanent shoreline. Fill to be placed will not deteriorate in the foreseeable future." In addition, the project's sponsors agreed to execute a "Permanent Shoreline Instrument" that would restrict any further filling of the bay in the project vicinity.

Appellants do not challenge this finding per se. Instead, they argue that section 66605, subdivision (f), was violated because BCDC, in approving the Pier 39 site for the aquarium, allowed additional fill to be "tacked on" to fill that had been approved in 1977 for the original Pier 39 complex. In doing so, appellants argue, BCDC ignored the permanent shoreline provision of section 66605, subdivision (f).

In considering appellants' argument it is instructive to look at the language of the statute itself: "[F]ill should be authorized when the filling would, to the maximum extent feasible, establish a permanent shoreline." (§ 66605, subd. (f).) If the Legislature had wanted to foreclose the approval of new fill in areas that had been filled in the past, it could have said so. But preclusive language is conspicuously absent. We note that the Legislature instead directed BCDC to establish a permanent shoreline "to the maximum extent feasible." This language sets only a broad standard and leaves much to BCDC's discretion in achieving its goals. In sum, this legislation is designed to assure that in approving bay fill, BCDC remains faithful to the particular substantive goal of establishing a permanent shoreline. It was not designed as a guarantee that fill already in place along the shoreline could never be altered.

---

[7]During the pendency of this appeal, appellants have requested that we take judicial notice of material outside the administrative record relating to several potential sites along the San Francisco waterfront which could possibly accommodate the aquarium project. These requests have been denied. The legislative scheme envisions that BCDC, not the courts, will identify and evaluate alternative locations. We are neither empowered nor equipped to do so. Our role in this process is limited—to determine whether BCDC's finding that there was no alternative upland location available for the aquarium project's purpose was supported by substantial evidence as developed in the administrative record. (Code Civ. Proc., § 1094.5, subds. (b) and (c).)

## VII. *Parks and Open Space*

■ Appellants next challenge BCDC's finding "that the project as proposed is 'complementary' to the Waterfront Park . . . and indeed will enhance park use." This finding was made necessary because 1,400 square feet of the aquarium building will encroach on Waterfront Park. BCDC explained that it was making this finding pursuant to the Special Area Plan which provides that bay fill in the Pier 39 area should be limited to "Bay-oriented commercial recreation [that is] complementary to park use."

Appellants argue that since a portion of the aquarium building will actually encroach on a portion of Waterfront Park, the following Bay Plan policy applies: "Limited commercial recreation facilities, such as small restaurants, should be permitted within waterfront parks provided they are clearly incidental to the park use . . . ." In summary, appellants argue that it was error for BCDC to apply the Special Area Plan standard of "complementary to park use" and to ignore the applicable Bay Plan standard of "clearly incidental to the park use."

In complex and detailed findings, BCDC explained its decision to use the Special Area Plan "complementary" standard rather than the Bay Plan "incidental" standard. To simplify BCDC's reasoning, the Special Area Plan directly addresses permissible uses in the Piers 39-41 area and represents an explicit clarification of the more general Bay Plan policies. As already noted, unless clearly erroneous or unreasonable, we give BCDC's interpretation deference.

In any event, while appellants present these two provisions as conflicting interpretations representing distinct policy objectives, we see no reason why a project cannot be both "complementary" and "incidental" to existing park use. The aquarium project certainly seems to qualify. The aquarium building will encroach upon only 1,400 square feet of Waterfront Park—less than 1 percent of the park's total 4.3 acres. This small encroachment is offset by the dedication of over 40,000 square feet of public access as a result of this project. BCDC found that the aquarium project would "enhance" the use of Waterfront Park. It further found that the aquarium project would improve public access and enjoyment of the bay at this portion of the park. These findings satisfy the requirements of both the Special Area Plan and the Bay Plan.

## VIII. *Views*

■ Appellants next argue that BCDC failed to comply with the Special Area Plan policy on views. That policy provides, in pertinent part: "Important Bay views along the Embarcadero and level inland streets should be

preserved and improved. Minor encroachment into the view corridors from level inland streets may be permitted under the following conditions: [¶] a. Where the encroaching element has a distinct maritime character . . . ." Appellants argue that the aquarium project encroaches on view corridors and that BCDC failed to make the required finding that the aquarium project has "a distinct maritime character."

Because the aquarium project required a waterfront location, any construction would necessarily involve some impact on existing views of the bay. The views that will be lost due to the project are primarily foreground views of the marina adjacent to Pier 39. BCDC specifically found: "The project will preserve all major view corridors which link the City and the Bay . . . ." The only view corridor along level, inland streets where BCDC found any view impact was the minor "one-block view corridor on Grant [Avenue] . . . ." The project would also "reduce views of the Bay from the Embarcadero and Beach Street by the width of the aquarium building along The Embarcadero." BCDC further concluded the "minor losses of views from adjacent streets will be more than offset by the views from the new second-level deck and enhanced public view areas." Obviously, BCDC's finding that "all major view corridors" would be preserved obviated any obligation under the Special Area Plan to find that the aquarium project had "a distinct maritime character."

Appellants do not dispute this logic, but instead make the argument that BCDC's finding that all major view corridors would be preserved cannot be reconciled with another BCDC finding that "development of the project will cause significant environmental impacts on views." However, when this finding is read in context it is apparent that it was reporting on the significant environmental effects of the aquarium project as identified in the already completed EIR. When an EIR has been completed by the lead agency which identifies one or more significant effects from a proposed project, a responsible agency is required to make findings concerning the avoidance or mitigation of the significant environmental effects identified in the report. (See Cal. Code Regs., tit. 14, § 15096, subd. (h).) In its finding on mitigation of view impacts, BCDC reported there had been further changes in the aquarium project's design since the project had been reviewed in the EIR. At BCDC's behest, a 40-foot view corridor had been added between the aquarium structure and Pier 39, and numerous new public viewing areas had been added. Based on these alterations, BCDC found that view impacts had been further mitigated to the extent feasible considering the project's waterfront location. Consequently, the record demonstrates that BCDC's findings on view impacts were not conflicting.

## IX. *Supplemental EIR*

 Appellants next complain that the removal of deteriorated pilings at Pier 43 did not receive adequate environmental review under CEQA. From the beginning of its consideration of the proposal, BCDC staff informed the project's sponsors that if new fill for the project was to be permitted on the basis that the aquarium project constituted "commercial recreation," the Bay Plan would require an equivalent amount of fill to be removed in the same geographic area as mitigation for the new fill.[8] The project's sponsors acknowledged this requirement and worked to convince BCDC to allow use of fill credits previously banked by the port. For reasons irrelevant to this appeal, it was determined that existing fill credits could not be used in mitigation, and that new fill removal would have to take place in the vicinity of the project.

After the project was approved by the City, and during the course of BCDC's review, Pier 43 was identified as the particular site for fill removal mitigation. In times past, ferries docked at Pier 43 to unload railroad cars. However, in modern times the pilings supporting the 77-year-old pier have become badly deteriorated, and it is fenced off from the public for safety reasons. The arch, bumper piles, and some railroad tracks are all that remain as reminders of this former activity on the bay.

The project's sponsors agreed to remove the 25,000 square feet of deteriorated pile-supported fill at Pier 43 in mitigation for placing an equivalent amount of new pile-supported fill in the bay for the aquarium. The sponsors further agreed that after Pier 43 was made safe and suitable for pedestrian use, new railings, informational plaques, benches and trash containers would be installed, opening up not less than 18,000 square feet of enhanced public access on the Pier 43 apron. BCDC made a finding that "[o]pening and improving the apron of Pier 43 with its unique focus on the historic railroad arch will provide substantial public benefits to the Fisherman's Wharf area and be a step toward implementing long term plans to upgrade the Fisherman's Wharf area."

The modified aquarium project was returned to the City for a determination whether a supplemental EIR was necessary. The City analyzed the proposed removal of 25,000 square feet of deteriorated pile-supported pier at

---

[8]Fill authorized for bay-oriented commercial recreation on publicly owned lands is subject to a number of specific limitations, including that the fill be limited to "replacement fill." This is in conformance with BCDC's policy on mitigation which establishes that all unavoidable impacts of fill should be offset by the removal of a similar kind of fill, preferably as close as possible to the site of the new fill.

Pier 43. It concluded that given the nature of the proposed modifications to the aquarium project, no substantial changes in the environmental effects of the aquarium project would occur and that no further environmental review was required. Appellants claim this finding was in error because the demolition of Pier 43 raised important new issues which should have been addressed by way of a subsequent or supplemental EIR under CEQA.

Initially, we point out that there is nothing in the record to support appellants' assertion that information relating to the demolition of Pier 43 was unavailable to interested parties. Counsel for appellants were alerted as early as December 1989 that Pier 43 would be removed to mitigate the placement of new fill at Pier 39, they were copied on all significant documents and they were in attendance at numerous public hearings where the demolition of Pier 43 was discussed. We also reject the notion that the EIR was somehow deficient in not discussing the environmental implications of demolishing Pier 43. While the EIR discussed BCDC's fill mitigation requirements, it did not specifically address the Pier 43 site because at the time the EIR was being prepared, the Pier 43 site had not been identified. An EIR is not required to foresee the unforeseeable. (Cal. Code Regs., tit. 14, § 15144.)

Once an EIR has been prepared and approved for a project, a supplemental EIR does not have to be prepared every time new information becomes available. Rather, a supplemental or subsequent EIR is only required where the new information involves "new significant environmental impacts not considered in a previous EIR . . . ." (Cal. Code Regs., tit. 14, §§ 15162, subd. (a)(1), 15163, subd. (a).) The CEQA regulations provide that an "addendum" will suffice when "[o]nly minor technical changes or additions are necessary" and the changes "do not raise important new issues about the significant effects on the environment." (Cal. Code Regs., tit. 14, § 15164, subds. (a)(2), (a)(3).)

▇▇▇▇ An agency's finding that a supplemental or subsequent EIR is unnecessary must be upheld if "the record as a whole contains substantial evidence to support a determination that the changes in the project were not so 'substantial' as to require 'major' modifications to the EIR." (*Bowman* v. *City of Petaluma* (1986) 185 Cal.App.3d 1065, 1075 [230 Cal.Rptr. 413], fn. omitted.) ▇▇▇▇ The City analyzed Pier 43's proposed removal in a June 6, 1990, memorandum. This memorandum meets the requirements for an addendum. (Cal. Code Regs., tit. 14, § 15164.)

The addendum concluded that the "long-term impacts on water quality and marine biology of the proposed modification would be generally positive." This conclusion is supported by an analysis of how certain microscopic water plants, fish species and water circulation would be affected by

the removal of the deteriorated piles. In addition, the impact resulting from the demolition activities were limited to "a short-term increase in water turbidity, and the temporary disturbance of habitat" and were determined not to be significant. The report concluded that "there could be no substantial change in the potential environmental effects of the project. Accordingly, no further evaluation is required." BCDC made a finding concurring with the City's conclusion that the changes to the aquarium project did not involve significant environmental impacts and that no further environmental review was required.[9]

 Although appellants never questioned the environmental effects of removing Pier 43 during the review process, they raise a multitude of concerns now. What is to happen to the historic railroad arch? Are there any sea lions congregating around Pier 43? Are there floating docks at Pier 43? Is there information about tidal flow in the Pier 43 area? Are there toxics in the bay mud that will be released when the deteriorated pilings are removed? The numerous public hearings held in this matter were the proper forum to present such inquiries, rather than this appeal. (Pub. Resources Code, § 21177.) The record contains substantial evidence supporting the City's determination that a supplemental or subsequent EIR was not required.

### X. *Port Commission's Finding*

 In approving the removal of Pier 43, the port commission failed to include a required recital that it had reviewed the EIR. (Cal. Code Regs., tit. 14, § 15164, subd. (c).) The failure to make this finding, while error, was merely a clerical oversight because the record undisputably shows the port commission had reviewed the EIR.

When viewed against the scope and importance of this project, the length and complexity of the administrative review, and the thousands of required findings, the significance of this omission is de minimis in the extreme. We would be elevating form over substance to send this cause back to the port commission to restate its finding in approved language in order to reach the same result.

### XI. *Conclusion*

After reviewing the voluminous record in this case, we are mindful of the importance of preserving the bay from further encroachment. As pointed out

---

[9]This finding is not surprising considering that in 1986, by a vote of 21 to 0, BCDC issued a blanket regionwide permit authorizing the removal of "structures or improvements that have deteriorated" anywhere in or along the bay. The authorization of this regionwide permit took into account "that the removal authorized by this regionwide permit *will have no substantial adverse impact on the environment*." (Italics added.)

in one of our prior decisions, "[p]ast diking and filling of tidelands and marshlands has already reduced the size of the bay from about 680 square miles in area to little more than 400." (*Acme Fill Corp.* v. *San Francisco Bay Conservation etc. Com.* (1986) 187 Cal.App.3d 1056, 1062 [232 Cal.Rptr. 348], italics omitted.) But it is not our role to second-guess the decisions that were made—we are limited to ensuring that the agencies involved proceeded in a manner required by law, that they made adequate findings, and that their findings were supported by the record. (Code Civ. Proc., § 1094.5, subd. (b).) All we decide today is that the decision was not legally flawed.

The judgment is affirmed.

King, J., and Hanlon, J.,* concurred.

A petition for a rehearing was denied November 30, 1992, and the opinion was modified to read as printed above. Appellants' petition for review by the Supreme Court was denied January 21, 1993.

---

*Judge of the San Francisco Superior Court sitting under assignment by the Chairperson of the Judicial Council.