[No. A059257. First Dist., Div. Two. June 24, 1994.]

THE PEOPLE ex rel. SAN FRANCISCO BAY CONSERVATION AND DEVELOPMENT COMMISSION, Cross-complainant and Appellant, v. LAWRENCE W. SMITH III et al., Cross-defendants and Appellants; DOUGLAS STORMS, Cross-defendant and Respondent.

COUNSEL

Daniel E. Lungren, Attorney General, Roderick E. Walston, Chief Assistant Attorney General, Jan. S. Stevens, Assistant Attorney General, Dennis M. Eagan and Marjorie E. Cox, Deputy Attorneys General, for Cross-complainant and Appellant.

Larry Moyer, Diane Karasik, Cynthia Cadua and Lawrence W. Smith III, in pro. per., and Abigail R. Marshall for Cross-defendants and Appellants.

Thomas W. Davis and Mary G. Swift for Cross-defendant and Respondent.

## OPINION

**SMITH, J.**—We uphold an injunction under the McAteer-Petris Act (Gov. Code, § 66600 et seq.; the Act)[1] against the offshore mooring of certain vessels in Richardson Bay as constituting "fill" for which permits from the San Francisco Bay Conservation and Development Commission (BCDC) are required under section 66632, subdivision (a) of the Act. We also reverse the denial of relief against the mooring of one other vessel.

### BACKGROUND

This action began as one for writ of mandate and declaratory relief against the Richardson Bay Regional Agency (a local joint powers agency), its constituent local governments of Mill Valley, Sausalito, Tiburon, Belvedere and Marin County, and some local officials. Vessel owners and operators suing as individuals and unincorporated associations calling themselves "The Mariners of Richardson Bay" and "Richardson Bay Community Association" filed suit in March 1988 to bar enforcement of a regional agency ordinance (No. 87-1) which, among other things, prohibited the offshore mooring of residential-use vessels in Richardson Bay and Belvedere Cove for periods longer than 30 days. BCDC intervened as a defendant to protect its interest in enforcement of the ordinance and its Richardson Bay Special Area Plan (the special area plan). The regional agency had been formed to implement the special area plan cooperatively with BCDC, and the ordinance was a part of that effort.

BCDC cross-complained for enforcement of the Act's permit requirements (§ 66632, subd. (a)), seeking an injunction and civil penalties against

---

[1]All further section references are to the Government Code unless indicated otherwise.

those plaintiffs who owned, controlled or lived aboard the disputed vessels. The regional agency then cross-complained against some plaintiffs, seeking nuisance abatement and injunctive relief under county code provisions and the ordinance. Ultimately, procedural developments and a memorandum of agreement (MOA) between other parties left only BCDC's cross-action, which was tried in two parts and finally disposed of by the orders which we review here.[2]

The court severed and tried first the case against Douglas Storms, who owned and resided on the Juniper, a 32-foot sailboat which he had moored in a special anchorage area of the bay for about 2 years and which by the time of trial he moored in a location assigned under the MOA. The court denied relief. Finding the boat "capable of active, self-propelled navigation," it rejected BCDC's arguments that the vessel was either floating "fill" or a "structure" (§ 66632, subd. (a)).[3] It also held, based on historical use of the Juniper's mooring sites " 'since Gold Rush days,' " that its mooring had created no "substantial change in use" (*ibid.*) and, based on current compliance with the MOA, caused no harm which the Act was intended to prevent.

BCDC prevailed against all other cross-defendants. The court concluded that their various "floating structures"—docks, barges, mooring buoys, houseboats, etc.—were all "structures" and "fill" under the Act. All were enjoined, with civil penalties imposed against two cross-defendants. The injunctions were conditionally stayed as to all MOA signatories until the MOA's April 1993 expiration date. Trial focused on whether the structures were navigable or "seaworthy," how long they had remained moored and whether they had operable engines.

---

[2]BCDC and the regional agency defendants secured an order sustaining their demurrer to plaintiffs' amended petition/complaint without leave to amend. Plaintiffs sought immediate review, but this court in December 1988 dismissed their appeal on motion (A044093). Later, under the MOA signed in 1990, the regional agency obtained dismissals of plaintiffs' action and a parallel action in federal district court in return for permitting vessels to be temporarily moored in designated areas subject to various conditions, including the use of "honey barge" service to carry off sewage and prevent its discharge into bay waters. BCDC concluded that the agreement violated the Act and so refused to join it and continued with its own cross-action.

[3]"Any person or governmental agency wishing to place fill, to extract materials, or to make any substantial change in use of any water, land or structure, within the area of the commission's jurisdiction shall secure a permit from the commission and, if required by law or by ordinance, from any city or county within which any part of the work is to be performed. For purposes of this title, 'fill' means earth or any other substance or material, including pilings or structures placed on pilings, and structures floating at some or all times and moored for extended periods, such as houseboats and floating docks. For the purposes of this section 'materials' means items exceeding twenty dollars ($20) in value." (§ 66632, subd. (a).)

Cross-defendants Lawrence W. Smith III, Cynthia Cadua, Larry Moyer, Diane Karasik and Louis Tenwinkle (defendants) appeal from the grant of relief. (Other cross-defendants have not appealed.) BCDC, after losing a motion for new trial as to Storms, cross-appeals from the denial of relief as to him.

## APPEAL

Defendants jointly raise several arguments against the court's conclusion that their offshore residences were "fill" under section 66632, subdivision (a). We uphold the conclusion based on the facts and the statutory language and purpose.

### Facts

Richardson Bay, a shallow arm of the greater San Francisco Bay, falls within BCDC's jurisdiction under the Act. (§ 66610, subd. (a).) It also falls within concurrent federal jurisdiction and has been designated a special anchorage area. (33 C.F.R. § 110.126a.) Defendants' vessels were all moored in publicly owned tide and submerged lands within the bay, without permits from BCDC. They were anchored or moored offshore, not berthed at marinas or other shore facilities, and lacked shore-connected utilities, including sewerage. By the time of trial in late April 1992, all vessels were in compliance with the MOA except those belonging to Tenwinkle, who had not signed it. Compliance earned the signatories temporary permits from the regional agency (but not BCDC; fn. 2, ante) and required, among other things, holding tanks for sewage and a "honey barge" sewage transfer service.

The Glass Barge is a steel-reinforced cement-hulled vessel owned by Larry Moyer and Diane Karasik. It had been the couple's residence since July 1987, was moored within the BCDC's jurisdiction through the time of trial and had no motor. Except for being onshore in fall 1990 in Galilee Harbor, where it was towed for repairs, the vessel was moored at or near its location near Waldo Point Harbor since at least early 1989. The court adjudged it "not seaworthy" and unable to be "safely navigated and maneuvered even in the protected waters of Richardson Bay."

The Phoenix (or TeePee)—"a cement barge with a 'Teepee' shaped structure constructed on top of it"—is owned by Lawrence Smith and was attached to floating docks also owned by him. It was Smith's principal residence and had been moored at or near its current location since at least July 1988. Smith testified that he had used three motors to move the vessel,

but the vessel had no permanently installed motor, and the court adjudged it "not seaworthy," even in the protected bay waters.

Cynthia Cadua owned the Pitcairn, a 50-foot wooden motor launch modified "to increase the size of the cabin area available for use as living quarters." She had lived there from the time she purchased it in October 1986 until spring of 1991 when, as the result of an injury, she moved into her parents' home in Hayward. She lived in Point Richmond by the time of trial (April 1992) but intended to move back onto the vessel by summer. The Pitcairn had been moored at or near the same spot for nearly two years and, before then, for several months to a year at a time at other offshore locations in Richardson Bay. The court found that the vessel, whose anchor would take half a day to raise, "could conceivably be seaworthy for use in protected waters" but that its engine had no functioning exhaust system (the exhaust port had been sealed off during hull work) and had not had one "for some time."

Louis Tenwinkle owned several structures. One, a barge with a crane on it, he acquired in 1991, but it had been sunken for some time by the time of trial, and had been posted for removal by local authorities at an estimated public cost of $60,000. The water was evidently only three to four feet deep, but the barge could not be raised and would have to be removed piece by piece. Moored in the same spot was the Upper Line, on which Tenwinkle had lived since late 1990; he lived there with his friend Lisa by the time of trial. He built the residence on the burned-out hull of a tugboat called the Kent in 1990, during this litigation. (His offshore residence before then, the Miller Avenue, was later found abandoned at a debris dock maintained by the Army Corps of Engineers (Army Corps), which later had it destroyed at a public expense of about $15,000.) A third vessel moored in the same spot was the Ballena, a steel work boat having a house on its aft end, an A-frame and winch, and two diesel engines. Tenwinkle at first used the boat for work but by the time of trial had not used it for a year or more, and neither of its engines worked. All three of the above structures sat moored together for at least a year before trial.[4] A fourth vessel, the Sioux City, was formerly a fishing boat. Tenwinkle built living quarters on it after it sank and was abandoned near the debris dock. It had no working engine, and he rented it out as a residence to a man to whom he was in the process of selling it at the time of trial.

---

[4]Before Tenwinkle acquired the barge, he kept the Ballena and Upper Line (then still the Kent) moored in the same area but closer to shore, along with another of his vessels, the tugboat Helen Wilder, which by the time of trial had sunk and been estimated (before it sank) to cost $14,000 to remove.

*Section 66632*

"To determine the intent of legislation, we first consult the words themselves, giving them their usual and ordinary meaning. [Citations.] When ' "statutory language is . . . clear and unambiguous there is no need for construction, and courts should not indulge in it." ' [Citations.] The plain meaning of words in a statute may be disregarded only when that meaning is ' "repugnant to the general purview of the act," or for some other compelling reason . . . .' [Citations.]" (*DaFonte* v. *Up-Right, Inc.* (1992) 2 Cal.4th 593, 601 [7 Cal.Rptr.2d 238, 828 P.2d 140].)

■ The Act requires permits before persons or entities may "place fill" within areas of the BCDC's jurisdiction, and it defines fill as (1) "earth or any other substance or material, including pilings or structures placed on pilings," and (2) "structures floating at some or all times and moored for extended periods, such as houseboats and floating docks. . . ." (§ 66632, subd. (a); fn. 2, *ante*.) The second category, what we will call floating fill, is at issue here.

Floating fill has not been discussed in any published opinion yet obviously has a three-part definition, requiring a (1) structure (2) floating at some or all times and (3) moored for extended periods. Those elements are not defined further, but the added examples, "such as houseboats and floating docks" (§ 66632, subd. (a)), provide guidance that houseboats at least presumptively satisfy all three elements. Defendants therefore try to distinguish their various residential vessels from houseboats. The effort is unconvincing.

First, the vessels are all "structures." Defendants call them "live-aboard anchor-outs," urging that these vessels are more apt to be navigable and self-propelled, are thus more like boats and thus should not be deemed "structures" under the Act. However, we must construe the Act broadly to effectuate its purpose of comprehensive regulation of development of the bay and shoreline (*Leslie Salt Co.* v. *San Francisco Bay Conservation etc. Com.* (1984) 153 Cal.App.3d 605, 616-617 [200 Cal.Rptr. 575] (*Leslie Salt*); *Blumenfeld* v. *San Francisco Bay Conservation etc. Com.* (1974) 43 Cal.App.3d 50, 56 [117 Cal.Rptr. 327] (*Blumenfeld*), and the Act's purpose with respect to "fill" is explicit. Section 66601 contains a legislative declaration "that uncoordinated, haphazard filling in San Francisco Bay threatens the bay itself and is therefore inimical to the welfare of both present and future residents of the area surrounding the bay . . . and that further piecemeal filling of the bay may place serious restrictions on navigation in the bay, may destroy the irreplaceable feeding and breeding grounds of fish

and wildlife in the bay, may adversely affect the quality of bay waters and even the quality of air in the bay area, and would therefore be harmful to the needs of the present and future population of the bay region." "Structure" is a particularly broad word in ordinary usage, and nothing in the legislative declaration suggests that limiting the term in the definition of fill (§ 66632, subd. (a)), as defendants would, furthers the Act's purpose. Legislative concern that piecemeal, haphazard filling of bay waters to the restriction of navigation, for example, is valid whether a residence is a houseboat or an anchor-out. In fact, anchor-outs logically place greater potential restrictions on navigation, with greater haphazard effect, since they are not moored in controlled areas close to shore. Likewise, concern about adverse effects on the quality of bay waters is the same or greater for anchor-outs, which by definition lack shore-connected utilities for sewage disposal.[5]

Seizing on the language "such as houseboats and floating docks" (§ 66632, subd. (a)), defendants invoke the doctrine of *ejusdem generis*, which holds that " ' "where general words follow the enumeration of particular classes of persons or things, the general words will be construed as applicable only to persons or things of the same general nature or class as those enumerated. The rule is based on the obvious reason that if the Legislature had intended the general words to be used in their unrestricted sense, it would not have mentioned the particular things or classes of things which would in that event become mere surplusage." ' [Citation.]" (*Peralta Community College Dist.* v. *Fair Employment & Housing Com.* (1990) 52 Cal.3d 40, 50 [276 Cal.Rptr. 114, 801 P.2d 357].) The rule "applies whether specific words follow general words in a statute or vice versa. In either event, the general term or category is 'restricted to those things that are similar to those which are enumerated specifically.' [Citations.]" (*Harris* v. *Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1160, fn. 7 [278 Cal.Rptr. 614, 805 P.2d 873].)

We see nothing dissimilar enough in defendants' vessels to warrant excluding them from the general language. The asserted distinctions between houseboats and live-aboard anchor-outs center on presumed navigability and

---

[5]The record is replete with evidence, some from the Regional Water Quality Control Board (RWQCB), that even small amounts of raw sewage (black water) introduce pathogens harmful to humans and wildlife and that the detergents found in galley, bath and shower water (gray water) harm fish. RWQCB had identified unsewered houseboats as a major remaining source of such pollution in Richardson Bay, where the problem is especially acute due to shallow waters, poor tidal flushing and intensive public use. RWQCB concerns about the use of holding tanks and "honey barge" pumping service, rather than shoreside sewer lines, arise from compliance-monitoring difficulties, expense, accidental discharge and spillage, holding capacity of tanks and user nonpayment for the service.

self-propulsion of the latter. This is a doubtful distinction on the facts of this appeal, where defendants' vessels are barely navigable, if at all, and apparently lack means of self-propulsion. Even so, whether a live-aboard vessel is *capable* of navigation or self-propulsion is a different inquiry than the pertinent statutory inquiry of whether the vessel has *in fact* remained "moored for extended periods" (§ 66632, subd. (a)). Defendants evidently view the Act as allowing limitless, haphazard obstruction of the bay by permanently anchored residential-use boats, simply because they are *capable* of moving and navigating under their own power. That is an absurd construction, at odds with the purposes of the Act. Section 66632, subdivision (a)'s language and purpose thus do not support the attempted distinction.

Nor do defendants gain anything in common understanding by calling their vessels more navigable, maneuverable or self-propelled than the usual houseboat. They concede that their residences are "vessels," and one common source defines "vessel" in part as "a usu. hollow *structure* used on or in the water for purposes of navigation: a craft for navigation of the water; esp: a watercraft *or structure* with its equipment *whether self-propelled or not* that is used or capable of being used as a means of transportation in navigation or commerce on water and that usu. excludes small rowboats and sailboats . . . ." (Webster's New Internat. Dict. (3d ed. 1965) p. 2547, italics added.) Another source similarly defines it as "Any *structure* designed to float upon and traverse the water for the carriage of persons or goods; a craft or ship of any kind, now usually one larger than a rowing-boat and often restricted to sea-going craft or those plying upon the larger rivers or lakes." (19 Oxford English Dict. (2d ed. 1989) p. 574, italics added.) The vessels at issue here are all "structures" in ordinary meaning.

Finally, the record supports findings that these vessels were "floating at some or all times and moored for extended periods . . . ." (§ 66632, subd. (a).) Whatever the limitations of the phrase "moored for extended periods" (the special area plan and implementing ordinance generally define this as 30 days or more in one place), there is no reason to doubt its application here, where evidence shows the vessels remaining moored for a year or longer. All three statutory elements for floating fill were thus satisfied.

Defendants find false support for a "navigation" distinction in BCDC's regulations (Cal. Code Regs., tit. 14, § 10110 et seq.). First, they mistakenly call them enactments by the Legislature, of equal dignity with the Act, when in fact they are BCDC regulations which would be invalid if they altered or impaired the Act's scope (*Blumenfeld, supra,* 43 Cal.App.3d 50, 57). In any event, the regulations are not inconsistent with the Act. One reads, "A

'houseboat' is a boat that is used for a residential or other nonwater-oriented purpose and that is not capable of being used for active navigation." (Cal. Code Regs., *supra*, § 10127.) Another reads, "A 'live-aboard boat' is a boat that is not a transient boat, that is capable of being used for active self-propelled navigation, and that is occupied as a residence as that term is defined in California Government Code Section 244." (*Id.*, § 10128.) Those regulations do draw a navigability distinction but do not suggest that house-boats are fill while live-aboard boats are not. We have already concluded that a distinction based on navigability does not further any apparent legis-lative purpose in defining "fill," although it may bear circumstantially on whether a vessel has been "moored for extended periods" (§ 66632, subd. (a)).

Navigability might also bear on whether a vessel serves a "water-orient-ed" versus "nonwater-oriented" use, but that distinction, contrary to defend-ants' view, does not alone affect what constitutes fill. The Act directs that "*further filling* of the San Francisco Bay . . . should be authorized only when public benefits from fill clearly exceed public detriment from the loss of the water areas and *should be limited to water-oriented uses* (such as ports, water-related industry, airports, bridges, wildlife refuges, water-oriented recreation and public assembly, water intake and discharge lines . . . ) . . . ." (§ 66605, subd. (a), italics added.) Thus fill, floating or otherwise, may in some circumstances be deemed permissible for "water-oriented uses," but this presupposes that it *is* fill. In other words, water-oriented use alone cannot remove a vessel from the definition of fill; at best it provides a possible reason for BCDC to allow it after weighing the public benefits and detriment. BCDC's San Francisco Bay Area Plan (1969, as amended) (Bay Plan), a study which the Legislature has adopted as its own (*Save San Francisco Bay Assn.* v. *San Francisco Bay Conservation etc. Com.* (1992) 10 Cal.App.4th 908, 918, fn. 5 [13 Cal.Rptr.2d 117]), provides specific guide-lines for such an assessment.[6]

As envisioned in the Bay Plan, housing is neither a water-oriented nor a public-trust use under the Act. (*Mein* v. *San Francisco Bay Conservation etc.*

---

[6]The Bay Plan, also without reference to the definition of fill, assumes that live-aboard boats are navigable. Its finding "e" under "Recreation" states: "Live-aboard boats are designed and used for active navigation but are distinguished from other navigable boats in that they are also used as a primary place of residence. Although residential use is neither a water-oriented [n]or a public trust use, live-aboard boats can be converted easily to a navigable, recreational use and, when properly located within a recreational boat marina, can provide a degree of security to the marina." (Bay Plan, p. 21.) It continues in policy "4.c." (*id.*, at pp. 21-22): "Live-aboard boats should be allowed only in marinas and only if: (1) The number would not exceed ten percent of the total authorized boat berths unless the applicant can demonstrate clearly that a greater number of live-aboard boats is necessary to provide security or other use incidental to the marina use; (2) The boats would promote and further the recreational boating use of the marina (for example, providing a degree of security), and are

*Com.* (1990) 218 Cal.App.3d 727, 733-734 [267 Cal.Rptr. 252].) Defendants here made long-term residential use of their vessels. They urged erroneously below that "navigability" and "water-oriented uses" (such as helping the occasional stranded boater or injured bird) took them out of the category of fill. More importantly, they never sought permits (§ 66632, subd. (f)) based on any argument that the "public benefits from [their] fill clearly exceed[ed] public detriment" (§ 66605), and BCDC of course made no such determination (fn. 6, *ante*). Their arguments to that effect here are therefore misdirected.

We likewise do not reach defendants' claims of error regarding the evidence, rulings and findings below about their vessels being "seaworthy" or "navigable." Undisputed evidence showed "moor[ing] for extended periods," and the court correctly found the structures to be floating fill (§ 66632, subd. (a)). No findings of navigability or seaworthiness could have altered those conclusions on these facts.

### Injunction

Defendants dispute the propriety of injunction. They argue that there was no serious risk of irreparable harm, only past risk which was largely removed by the time of judgment (see generally, *Donald* v. *Cafe Royale, Inc.* (1990) 218 Cal.App.3d 168, 184 [266 Cal.Rptr. 804]; *Mallon* v. *City of Long Beach* (1958) 164 Cal.App.2d 178, 190 [330 P.2d 423]) by compliance with the safety and sanitary conditions of the MOA. Defendants note that the court found such compliance (Tenwinkle had neither signed nor complied) "evidence that their . . . presence on the Bay is not causing the kinds of harm to the Bay contemplated under the [Act]" yet found harm in that the vessels were "not safely navigable and seaworthy" and that some dumping of debris and gray water continued. They again dispute the navigable/

located within the marina consistent with such purpose; (3) The marina would provide, on land, sufficient and conveniently located restrooms, showers, garbage disposal facilities, and parking adequate to serve live-aboard boat occupants and guests; (4) The marina would provide and maintain an adequate number of vessel sewage pumpout facilities in locations that are convenient in location and time of operation to all boats in the marina, particularly live-aboard boats, and would provide the service free of charge or at a reasonable fee; and (5) There would be adequate tidal circulation in the marina to mix, dilute, and carry away any possible wastewater discharge. Live-aboard boats moored in a marina on July 1, 1985, but unauthorized by the Commission, should be allowed to remain in the marina provided the tests of (2), (3), (4), and (5) above are met. Where existing live-aboard boats in a marina exceed ten percent of the authorized berths, or a greater number is demonstrated to be clearly necessary to provide security or other use incidental to the marina use, no new live-aboard boats should be authorized until the number is reduced below that number and then only if the project is in conformance with tests (1), (2), (3), (4), and (5) above."

seaworthy finding, urge that evidence of continued dumping was not enough on balance to justify an injunction and urge error in that the court did not expressly find irreparable harm from their having moored their vessels without permits.

We find the injunction supported. The court found that the vessels were "fill" under the Act and moored without required permits from BCDC (§ 66632, subd. (a)). That was the essential violation of the Act, and there was no evidence that any of defendants had ceased mooring their vessels or obtained the required permits before judgment. What defendants seek by their attack on the peripheral issues of navigability and harm as to each vessel is a judicial reexamination of the wisdom of the statute, something which we cannot do under the rubric of "irreparable harm." The Act is "environmental legislation that represents the exercise by government of the traditional power to regulate public nuisances. [Citation.] Such legislation 'constitutes but "a sensitizing of and refinement of nuisance law." ' [Citation.]" (*Leslie Salt, supra*, 153 Cal.App.3d 605, 618.) "Where the Legislature has determined that a defined condition or activity is a nuisance, it would be a usurpation of the legislative power for a court to arbitrarily deny enforcement merely because in its independent judgment the danger caused by a violation was not significant. The function of the courts in such circumstances is limited to determining whether a statutory violation in fact exists, and [if disputed] whether the statute is constitutionally valid." (*City of Bakersfield* v. *Miller* (1966) 64 Cal.2d 93, 100 [48 Cal.Rptr. 889, 410 P.2d 393].) The legislatively declared harm here is that "uncoordinated, haphazard filling" threatens the bay itself, is therefore inimical to the public welfare and that "further piecemeal filling" "may" seriously restrict navigation, destroy "irreplaceable" aquatic habitat and adversely affect bay area air and water quality. (§ 66601.) The focus on "haphazard" and "piecemeal" filling shows that irreparable harm from any one or more instances of fill is not required. The evil is *cumulative* impact which threatens "the bay as the most valuable single natural resource of an entire region, a resource that gives special character to the bay area" (§ 66600).[7] The court below presumably took defendants' corrective actions into account in fixing civil penalties (§ 66641, subd. (b)), but they did not alter the fact that the vessels were unauthorized fill. No abuse of discretion is shown in the issuance of injunction.[8]

---

[7]Defendants urge that compliance with the MOA satisfied the Act's goal of controlling and regulating bay fill. Not so. The Act places control and regulation in the hands of BCDC, and BCDC refused to join in the MOA.

[8]Defendants wrongly contend that they had to be "landowners" in order to be held "strictly liable" for their unauthorized moorings. The case they cite concerned holding an owner of

*Notice of trial*

■ Tenwinkle presents one additional argument, that the judgment is void as to him for failure to serve him with 15 days' notice of the continued trial date of April 14, 1992. Tenwinkle acted in propria persona and did not appear then or during the several hearing days through April 29, when the last evidence was taken and the case was submitted. We find no invalidity.

Subdivision (a) of Code of Civil Procedure section 594 provides that a party may try and bring to judgment an issue of fact in the absence of the adverse party but must first prove to the court's satisfaction that 15 days' notice of the trial was given. Subdivision (b) of the section requires notice by mail, served either by the clerk of the court 20 days, or by any party 15 days, beforehand. It provides that, if served by a party: "[P]roof may be made by introduction into evidence of an affidavit or certificate pursuant to subdivision (1) or (2) of Section 1013a or other competent evidence. The provisions of this subdivision are exclusive." (Code Civ. Proc., § 594, subd. (b).) Compliance with subdivision (a) is mandatory and jurisdictional (*Minkin* v. *Levander* (1986) 186 Cal.App.3d 64, 70 [230 Cal.Rptr. 592]; *Martin* v. *K & K Properties, Inc.* (1987) 188 Cal.App.3d 1559, 1567 [230 Cal.Rptr. 592]); the requirements of subdivision (b) are not jurisdictional (*Isherwood* v. *Hyrosen Properties, Inc.* (1987) 194 Cal.App.3d Supp. 33, 36-37 [240 Cal.Rptr. 157]). One case has held, in apparent tension with the view of subdivision (b) as not jurisdictional, that failure to formally place proof of service in evidence, as subdivision (b) specifies "may" be done, voids a judgment even though proof of service was on file with the trial court and is a part of the record on appeal. (*Irvine National Bank* v. *Han* (1982) 130 Cal.App.3d 693, 697-698 [181 Cal.Rptr. 864] [*Irvine*]; contrast *Kalmus* v. *Kalmus* (1951) 103 Cal.App.2d 405, 419 [230 P.2d 57] [reviewing court considered documents on file which the lower court could have judicially noticed].)

There was no proof below that Tenwinkle was given 15 days' notice of the April 14 date. BCDC offered its efforts to effect substituted service on Tenwinkle, but this showed only 10 days' notice and may have fallen short of strict subdivision (b) compliance in some other respects as well.[9] Nevertheless, April 14 was a *continued* trial date to which the statute did not apply

---

bayside land strictly liable for fill which the owner did not place there. (*Leslie Salt, supra,* 153 Cal.App.3d 605, 618-622.) Defendants here knew about and controlled the fill—their own residences—at all times.

[9]Counsel for BCDC explained to the court on the morning of April 14: "I arranged to have Mr. Tenwinkle served with a notice of the continued trial date by the deputy sheriff today [probably Todt]. [¶] He was unable to locate Mr. Tenwinkle personally; however he left a

(*Parker* v. *Dingman* (1975) 48 Cal.App.3d 1011, 1016 [122 Cal.Rptr. 309]), and the record shows that Tenwinkle had actual notice of the trial dates before that point yet evidently failed to keep himself informed thereafter through diligent inquiry (*City etc. of San Francisco* v. *Carraro* (1963) 220 Cal.App.2d 509, 518 [122 Cal.Rptr. 309] [*Carraro*]).

Trial of this action was initially set for October of 1991, but a series of events delayed it, among them severance of the trial against Storms, a peremptory challenge against one judge, reassignment to Judge Lynn O'Malley Taylor and a March 5, 1992 settlement conference before that judge which Tenwinkle personally attended. There is no need to explore events any earlier than March 5 because Tenwinkle's personal attendance on that date gave him *actual* notice. Tenwinkle boldly claims that "whether [he] had *actual* notice is simply irrelevant" and that actual-notice cases predating the 1975 statutory changes noted in *Irvine* "no longer govern." He is mistaken. "The purpose of the mandatory notice . . . is merely to protect parties against trials, dismissals or judgments in their excusable absence. Hence, compliance may be waived or excused . . . ." (7 Witkin, Cal. Procedure (3d ed. 1985) Trial, § 80, p. 82.) For example, "[*a*]*ctual notice* for the required period is . . . sufficient to overcome any defect in the proof of service of notice," and "[*i*]*ndirect notice* may be sufficient, where derived from . . . fixing of the time and place at the pretrial conference (imparts actual notice to counsel or parties present) . . . ." (*Id.*, § 80, at p. 82.) The current section does make its provisions "exclusive" on the manner of proof of service, resolving prior case law confusion on "what kind of proof was required to show that notice had been given" (*Irvine, supra*, 130 Cal.App.3d 693, 697; Code Civ. Proc., § 594, subd. (b)), but waiver or excuse, to which actual notice pertains, rest on a different premise than proof of service of notice. They are equitable concepts, the applicability or "proof" of which the current section does not purport to address or control.

copy of the notice with the individual with whom Mr. Tenwinkle resides on his boat, the Upper Line." Counsel submitted a copy of the notice and continued: "I also gave the deputy sheriff today [Todt] another subpoena and a new notice after we were unable to begin on the seventh, but when I went upstairs to pick those up this morning, the clerk could not find them. I will try and acquire those at the lunch hour and submit that to the Court as well."

A "Notice of Continued Trial Date" filed April 14 has a "Sheriff's Not Found/Non-Service Return" attached. Dated April 7 and signed by "R. Todt," it states: " 'Notice of Hearing' date only was left on barge with a female named Lisa. Mr. Tenwinkle was to pick up subpena at Civil Division/Sheriff's Dept. prior to court date. He did not." In a version amended and signed by Todt on April 23 and admitted at trial that day as an exhibit, the deputy further declared: "Lisa is an adult female who I know of my own personal knowledge to live on Mr. Tenwinkle's houseboat next to the crane barge in Richardson Bay. The notice was served on 4/4/92 @ 1531 hrs." Tenwinkle asserts on appeal that the amendment was unsworn, did not satisfy the "affidavit or certificate" requirement (Code Civ. Proc., § 594, subd. (b)) and was somehow "incompetent hearsay" in its reference to personal knowledge. We do not decide.

The per curiam opinion in *Irvine* dismissed a dispute about whether the absent party there "did or did not receive actual notice of trial," suggesting that the arguments "might be relevant" in a hearing on a motion for relief from default (Code Civ. Proc., § 473) but were "not pertinent" to the issue of compliance with the notice provision. (*Irvine, supra,* 130 Cal.App.3d 693, 697.) To the extent that *Irvine* suggests that waiver and excuse are currently subsumed within the statute's proof requirements, we respectfully disagree. No case has so far felt constrained by that view. (See, e.g., *Berris & Seaton* v. *Meyers* (1984) 163 Cal.App.3d Supp. 54, 60-61 [210 Cal.Rptr. 444] [finding waiver from a stipulated continuance and distinguishing *Irvine* as not involving mention of a stipulation in the judgment].) *Irvine*'s reference to relief-from-default hearings is puzzling. Earlier cases had sometimes involved review of motions for relief from default (e.g. *Parker* v. *Dingman, supra,* 48 Cal.App.3d 1011, 1016-1019), but that was not always true. *Carraro,* a leading case from our own division, had relied on actual notice where no trial motion directed to the trial-notice issue was brought. (*Carraro, supra,* 220 Cal.App.2d 509, 517, 520-522 [set-aside motion challenged only denial of continuance].) It would be bad policy to adopt Tenwinkle's view and, in effect, reward a party on appeal for failing to seek relief in the trial court. Here, for example, Tenwinkle made no effort to seek relief or set aside the judgment, despite a lengthy period of trial and being served with the judgment. We hold that actual notice remains relevant on appeal even though no trial-level motion for relief on notice grounds was brought.

The case had been assigned out for trial before Judge Taylor to commence March 5. Tenwinkle attended the settlement conference in chambers that day, right after which, the minutes reflect, the judge in open court continued the matter "to Master Trial Calendar on March 23, 1992, at 9:00 a.m." At that time, the master calendar judge continued the matter to Judge Taylor's calendar for April 7 at 9:30 a.m. Our record does not indicate whether Tenwinkle was present or made any inquiry. (A notice of continued trial date indicates that trial was set to commence April 7 and continue on April 8 and April 14.) For reasons not clear from the record (BCDC represents that Judge Taylor took ill), the matter was again continued and did not actually begin until April 14. BCDC explained to Judge Taylor its efforts to personally serve Tenwinkle with further notice and submitted a deputy sheriff's statements that, on April 10, he left notice at Tenwinkle's vessel the Upper Line with Lisa, a woman whom the deputy knew to live there with Tenwinkle (see fn. 9, *ante*). Trial proceeded on April 14, 21, 22, 23, 28 and 29, without any appearance by Tenwinkle. The statement of decision contains a finding that Tenwinkle resided on the Upper Line "with his friend 'Lisa' . . . ."

Tenwinkle's presence at the March 5 settlement conference gave him actual notice that the matter was continued to March 23. Formal notice was excused (*Bird* v. *McGuire* (1963) 216 Cal.App.2d 702, 715 [31 Cal.Rptr. 386]; *Carraro, supra,* 220 Cal.App.2d 509, 521), and he had a duty to keep himself "informed by diligent inquiry of all subsequent continuances" (*Carraro, supra,* at p. 518). That was true whether the taking of evidence began on the next set date (*Parker* v. *Dingman, supra,* 48 Cal.App.3d 1011, 1016) or, as it turned out, a series of further continuances delayed the taking of evidence (*Carraro, supra,* at pp. 520-522). The record discloses no reasonable diligence by Tenwinkle to keep himself apprised of events. Tenwinkle would have us require repeated 15 days' notice at every continuance before the taking of evidence, but that would cripple court efficiency. No continuance of fewer than 15 days would be possible. BCDC did not have to give Tenwinkle renewed formal notice under Code of Civil Procedure section 594 after the settlement conference. However, BCDC's less formal efforts did accord with authority holding, on due process grounds, that a trial court may in some cases abuse its discretion by proceeding without "some reasonable assurance" that an absent party will be informed. (*Parker* v. *Dingman, supra,* 48 Cal.App.3d at p. 1018; but see *Oats* v. *Oats* (1983) 148 Cal.App.3d 416, 420 [196 Cal.Rptr. 20].) Attempted personal service and substitute service on the housemate Lisa certainly satisfied any such requirement here.

### CROSS-APPEAL

BCDC cross-appeals from that part of the judgment denying relief against the mooring of Douglas Storms's vessel, the Juniper. In light of that trial record and our conclusions regarding the scope of floating fill under the Act, we hold that the court abused its discretion in denying relief.

The Juniper is a 32-foot sailboat which Storms resided on and kept moored in 2 sites on Richardson Bay for periods of a year or more each without a permit from BCDC. The court, persuaded that the Act did not cover vessels capable of "active, self-propelled navigation," found that the vessel was not a "structure" and hence not "fill" (§ 66632, subd. (a)). As we have already held, however, "structure" plainly includes just such a live-aboard vessel, as substantially equivalent to a houseboat, and the Act does not support a distinction based on navigability except as the ability to navigate bears on whether a vessel has been "moored for extended periods" (*ibid.*). Storms offers a variation on the *ejusdem generis* argument, asserting that the illustrative phrase "such as houseboats and floating docks" (*ibid.*), by using the conjunctive "and" rather than the disjunctive "or," means structures like *houseboats with floating docks attached.* We reject such a rigid

meaning. It would absurdly result in floating docks *not* attached to vessels being exempt, for no discernible policy reason. Also, while it would be helpful to have statutory language directly illustrating what "structure" means (e.g. *Delucchi* v. *County of Santa Cruz* (1986) 179 Cal.App.3d 814, 824-825 [225 Cal.Rptr. 43] [Pub. Resources Code, § 30106]), the absence of it here does not help Storms, and the illustrative language refers specifically to houseboats. We also agree with the Attorney General's observation that to use the doctrine of *ejusdem generis* as a *limitation* on "structure," rather than an illustration of expansive reach, arguably cramps the overall context of language defining fill as "earth *or any other substance or material, including . . .* structures floating *. . .* and moored for extended periods, such as houseboats and floating docks" (§ 66632, subd. (a), italics added).[10]

The trial court thus erred as a matter of law in ruling that the Juniper was not a "structure." That error led the court to decline considering whether the vessel was moored "for extended periods." However, what conclusion to draw from undisputed facts is a question of law (*Morrison* v. *State Board of Education* (1969) 1 Cal.3d 214, 238 [82 Cal.Rptr. 175, 461 P.2d 375]), and the facts here show beyond question a mooring "for extended periods." The Juniper sat in open waters for a year at each of two bay sites about one hundred yards apart, attached at each site by rope and chain to a mooring buoy anchored to the bay bottom. A retired Coast Guard commander and current interim harbor master who saw the area every work day for three years never once saw the vessel move. Storms did not testify but called a man whom he had helped once in late 1990 when a dinghy capsized. The man gave no dates but recalled seeing the Juniper twice under sail and once motoring. That was the only evidence that it ever moved during the two or more years it was moored. While in the future cases may arise in which the phrase "extended periods" is difficult to apply, the evidence here shows a mooring for "extended periods" under any rational construction of the statute. It is clear that the mooring of a vessel for years in essentially the same place, with only three moves, was a mooring for "extended periods" under the statute, making the vessel floating fill.

---

[10]Storms invites us to consider an April 1991 declaration by Senator (formerly Assembly-man) Nicholas C. Petris, one of the Act's co-authors, who offered his "opinion" that "the term 'fill' . . . was not intended to include boats or other vessels moored offshore, whether or not used for residential purposes." We decline. First, the Act's unambiguous meaning makes resort to indicia of intent improper. (*Mutual Life Ins. Co.* v. *City of Los Angeles* (1990) 50 Cal.3d 402, 407 [267 Cal.Rptr. 589, 787 P.2d 996].) Second, the declaration does not illuminate legislative intent. "[I]n construing a statute we will not consider as evidence in favor of a particular meaning the opinions of individual legislators who voted for the bill nor those of the author, on the ground there is no assurance that other legislators shared such opinions." (*Lungren* v. *Deukmejian* (1988) 45 Cal.3d 727, 742 [248 Cal.Rptr. 115, 755 P.2d 299]; *Taxpayers to Limit Campaign Spending* v. *Fair Pol. Practices Com.* (1990) 51 Cal.3d 744, 764-765, fn. 10 [274 Cal.Rptr. 787, 799 P.2d 1220].)

Building on hypothetical questions he posed below to a BCDC executive director, Storms urges that the language "for extended periods" is unconstitutionally "vague and overbroad" in reach. However, while some of his hypotheticals revealed potential uncertainty in other circumstances, Storms is limited to a review confined to the facts of his own case (*Bowland* v. *Municipal Court* (1976) 18 Cal.3d 479, 492 [134 Cal.Rptr. 630, 556 P.2d 1081]; *Fort* v. *Civil Service Commission* (1964) 61 Cal.2d 331, 338 [38 Cal.Rptr. 625, 392 P.2d 385]), facts which posed no uncertainty. Storms "cannot complain of the vagueness of a statute if [his own conduct] falls clearly within its bounds" (*Bowland* v. *Municipal Court, supra,* 18 Cal.3d at p. 492), as it does. His effort to raise hypothetical situations of others fails unless he can identify substantial encroachment of First Amendment rights. (*Id.,* at p. 493; *Fort* v. *Civil Service Commission, supra,* 61 Cal.2d 331, 338; *People* v. *Fogelson* (1978) 21 Cal.3d 158, 163 [145 Cal.Rptr. 542, 577 P.2d 677].) However, he asserts only a violation of his "right to be in a public place," meaning apparently a First Amendment right to reside unregulated in public tidelands. We know of no such right, and his broader challenge accordingly fails.

We have already held that compliance with the MOA, with attendant mitigation of potential harms, does not remove the need for injunction. The trial court's finding that "[n]o competent evidence" showed that Storms's "navigable sailboat produces or threatens the type of harm to the environment which the Legislature contemplated" is simply wrong. It was based on MOA compliance, stressing pollution and arguable safety concerns of the Act over the Act's overriding purpose of halting "self-generated and unregulated fill activities" which obstruct public use of bay waters. (*People* ex rel. *S. F. Bay etc. Com.* v. *Town of Emeryville* (1968) 69 Cal.2d 533, 544 [72 Cal.Rptr. 790, 446 P.2d 790]; §§ 66600-66601.) The court noted evidence, uncontradicted below, that houseboats and live-aboards "impede recreational use of the Bay in that they occupy navigable areas that would otherwise be available for such use," and it found that the Juniper was moored without any permit or permit application. Because the evidence conclusively showed floating fill placed without a permit, the court could not frustrate the legislative will by reevaluating harm. (*City of Bakersfield* v. *Miller, supra,* 64 Cal.2d 93, 100.)

Thus, on the facts before it, the court abused its discretion by not issuing an injunction. That conclusion leaves no need to consider whether an injunction was alternatively compelled for the mooring having effected a "substantial change in use" of bay waters. (§ 66632, subd. (a); see fn. 3, *ante.*)

## DISPOSITION

The judgment is reversed insofar as it denies BCDC injunctive relief against the mooring of Storms's vessel, and the cause is remanded with directions to issue an injunction and consider further relief. The judgment is in all other respects affirmed. Costs on the appeals and cross-appeal go to BCDC.

Kline, P. J., and Phelan, J., concurred.